## PITTSBURGH & W. V. RY. CO. et al. v. INTERSTATE COMMERCE COM-MISSION et al.

(Court of Appeals of District of Columbia.   Submitted November 5, 1923.
Decided December 3, 1923.)

### No. 3986.

1. **Commerce ⬅57—Constitutional law ⬅297—United States ⬅5—Federal act, requiring carrier to obtain permission before issuing stock or bonds, held valid.**

Interstate Commerce Act, § 20a (Comp. St. Ann. Supp. 1923, § 8592a), requiring a carrier to obtain permission from the Interstate Commerce Commission before issuing any stock or bonds or assuming any obligation with respect to securities of other parties, though permitted to do so by the authority creating carrier corporation, *held* a valid interstate commerce regulation, within the power of Congress, and not contrary to Const. Amend. 10, or a taking of property without due process.

2. **Commerce ⬅8(1)—Congressional act, pursuant to constitutional sanction, supreme law.**

A law of Congress regulating interstate commerce, enacted pursuant to express constitutional sanction, is the supreme law of the land, anything in the Constitution or laws of any state to the contrary notwithstanding.

3. **Commerce ⬅96—Judgment of Interstate Commerce Commission not controllable by injunction.**

Where the Interstate Commerce Commission, acting within its jurisdiction, was called on to exercise its discretion in a matter depending on issues of fact, its judgment cannot be reviewed or controlled by injunction.

Appeal from the Supreme Court of the District of Columbia.

Suit for an injunction by the Pittsburgh & West Virginia Railway Company and the West Side Belt Railroad Company against the Interstate Commerce Commission and Harry M. Daugherty, Attorney General of the United States. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

Frank M. Swacker, of Washington, D. C., for appellants.

J. Carter Forte, of Washington, D. C., for appellee Interstate Commerce Commission.

Blackburn Esterline, of Washington, D. C., for appellee Attorney General.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and MARTIN, Presiding Judge of the United States Court of Customs Appeals.

VAN ORSDEL, Associate Justice. Appellants, railway companies, appeal from a decree of the Supreme Court of the District of Columbia dismissing their bill for an injunction to restrain the Attorney General and the Interstate Commerce Commission from proceeding to enforce penalties or forfeitures, or otherwise interfering with the issuance of stock and the assumption of certain liabilities by the Pittsburgh & West Virginia Railway Company, hereafter for convenience referred to as the Pittsburgh Company.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It appears that the Pittsburgh Company owns the entire capital stock of the West-Side Belt Railroad Company, hereafter referred to as the Belt, amounting to $1,080,000. It further appears that the Pittsburgh Company has made advances to the Belt for construction purposes amounting to over $6,000,000, for which it holds the interest-bearing notes of the Belt Company.

On September 21, 1920, appellant companies entered into an agreement whereby the Pittsburgh Company obligated itself to purchase the property of the Belt, in payment of which the Pittsburgh Company was to issue and deliver $7,400,000 par value of its stock, the stock to be accepted back by it in liquidation of the notes and in exchange for the existing stock of the Belt. The Belt Company was then to be dissolved. The transaction amounted to a transfer of the railway property to the Pittsburgh Company, the dissolution of the Belt corporation, and an issue of stock by the Pittsburgh Company to an amount equal to the indebtedness and outstanding stock of the Belt Company. It is averred in the bill that the transaction is authorized by the charters of the respective corporations and the laws of the state of Pennsylvania, under which they were incorporated.

On November 26, 1920, appellants filed with the Interstate Commerce Commission two applications, docketed as Nos. 1107 and 1108. Application 1107 was made under paragraph 18, § 1, of the Interstate Commerce Act (41 Stat. 477 [Comp. St. Ann. Supp. 1923, § 8563 (18)]), for a certificate to the effect that the present or future public convenience or necessity justify the carrying out of the agreement. The application in 1108 was made under section 20a of the Interstate Commerce Act, 41 Stat. 494 (Comp. St. Ann. Supp. 1923, § 8592a), which forbids—

"any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier * * * or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption."

The Commission is then authorized to make the order only in the event that it finds the object sought by the application to be lawfully within its corporate purposes and compatible with the public interest, and that the granting of the certificate will not impair the applicant's ability to perform the service of a public carrier.

These applications were denied by the Commission, and thereafter on January 17, 1922, the Pittsburgh Company filed another application, which sought the approval of the acquisition of the property and assumption of the debts of the Belt Company under paragraph 2 of section 5 of the Interstate Commerce Act, 41 Stat. 481 (Comp. St. Ann. Supp. 1923, § 8567) which provides:

"Whenever the Commission is of opinion, after hearing, upon application, of any carrier or carriers engaged in the transportation of passengers or

property subject to this act, that the acquisition, to the extent indicated by the Commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the Commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises."

Upon the denial of this application by the Commission, appellants filed the present bill in the Supreme Court of the District of Columbia, and from an order of the court dismissing the bill, the case comes here on appeal.

[1, 2] The validity of section 20a, supra, is questioned on the ground that it is not a regulation of Interstate Commerce, nor within the power of Congress, but is instead a usurpation of states' rights contrary to the Tenth Amendment of the Constitution of the United States. It is authoritatively asserted that with one or two exceptions all the railroad corporations of the country are organized under state laws, and it is contended are subject exclusively to the constitution and laws of the states in which they were created. We are not impressed by this contention. Unquestionably every state has plenary power over its corporations, but when that power comes in conflict with the exercise by Congress of a power expressly conferred by the Constitution, the authority of the state must yield. We are here considering the power of Congress to regulate interstate commerce; in that field the authority of Congress is supreme. A law of Congress enacted pursuant to express constitutional sanction, is the supreme law of the land, "anything in the Constitution or laws of any state to the contrary notwithstanding." Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. Or as was said by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 197, 6 L. Ed. 23, relative to the power of Congress to regulate interstate commerce:

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States."

This principle was approved in Minnesota Rate Cases, 230 U. S. 352, 399, 33 Sup. Ct. 729, 739 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), where the court said:

"There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations."

See, also, Railroad Commission of Wisconsin et al. v. Chicago, Burlington & Quincy Railroad Co., 257 U. S. 563, 588, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086.

But it is urged that the authority conferred by the act upon the Interstate Commerce Commission is not within the power of Congress. In other words, an act of Congress purporting to deal with commerce must have some substantial relation to interstate commerce before it can be sustained and that the issuance of stock, the assumption of indebtedness, the purchase of stock resulting in the control of one railroad line by another, or indeed resulting in the consolidation of the roads, has no such relation to commerce as to justify their supervision and regulation by Congress.

We think the power thus conferred by Congress has a direct relation to commerce and forms an important factor in the general scheme for the regulation of commerce by the railway systems of the country as set forth in the Transportation Act. The power of the Commission to regulate rates for the protection of the public and the carrier alike is settled. If this mutual protection is to be fully administered supervision of the whole matter of the issue of capital stock, investment, and incurring of bonded indebtedness, as well as the extension and consolidation of railways lines, becomes so directly interrelated with the problem of maintaining a just relation between the public and the carrier, that they fall clearly within the constitutional authority of Congress to regulate interstate commerce.

As suggested, section 20a is not a statute standing alone; it is merely a part of a general scheme of regulation which Congress deemed essential to the establishment of a new federal railway policy. As was said in the New England Divisions Case, 261 U. S. 184, 189, 43 Sup. Ct. 270, 273 (67 L. Ed. 605):

"The Transportation Act of 1920 introduced into the federal legislation a new railroad policy. Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. R. Co., 257 U. S. 563, 585. Theretofore the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language, and to attain it, new rights, new obligations, new machinery, were created. The new provisions took a wide range. Prominent among them are those specially designed to secure a fair return on capital devoted to the transportation service. Upon the Commission, new powers were conferred and new duties were imposed.

"The credit of the carriers, as a whole, had been seriously impaired. To preserve for the nation substantially the whole transportation system was deemed important."

If "a fair return on capital devoted to the transportation service" was to be insured the railway companies; and at the same time proper service and equitable rates accorded the public, the supervision of the issuance of stock, the incurring of bonded indebtedness, the extension and consolidation of railway lines, becomes of the utmost importance. Without this power to supervise the issue of stock and bonds, and thus limit the dividend and interest obligations of the carriers, as well as the expenditures in extensions and improvements, the fixing of ade-

quate rates to insure a just return to the carrier, and at the same time equitable protection to the public, would be impossible. The relation of the carrier to the public which it serves is so inseparable that proper regulation must embrace every instrumentality which has any substantial relation to commerce.

This disposes of the contention that appellants have been deprived of their property without due process of law, since the act in question merely restricts the appellants in the use of their property in response to a proper regulation of interstate commerce.

[3] It follows that, in the proceeding had before the Interstate Commerce Commission, the Commission, acting clearly within its jurisdiction, was called upon to exercise its discretion in a matter depending upon issues of fact. It is elementary that in such a proceeding the judgment of the Commission cannot be reviewed or controlled by injunction.

The decree is affirmed, with costs.

Appeal to Supreme Court of the United States allowed December 7, 1923.