### In re COMMUNITY POWER & LIGHT CO.

District Court, S. D. New York.
June 15, 1940.

---

Chester T. Lane, Gen. Counsel, and Lawrence S. Lesser, Frank J. Gillis, and F. Arnold Daum, all of Washington, D. C., for Securities and Exchange Commission.

Albridge C. Smith and Prescott R. Andrews, both of New York City, for Community Power and Light Co.

HULBERT, District Judge.

This is an application by the Securities and Exchange Commission made at the request of Community Power and Light Company (hereinafter called "The Company") for an order pursuant to Section 11(e) of the Public Utility Holding Company Act of 1935, 49 Stat. 822, U.S.C.T. 15, Sec. 79k(e), 15 U.S.C.A. § 79k(e).

The Company is a Delaware corporation and a holding company as defined by Sec-

tion 2(a) (7) (A) of the Act, 15 U.S.C.A. § 79b(a) (7) (A), and has its principal executive offices in the Borough of Manhattan, City of New York.

The Company owns, controls and holds with power to vote all of the outstanding voting securities of the following public utility companies: Arkansas Utilities Company; The Kansas Utilities Company, Missouri Utilities Company and Texas-New Mexico Utilities Company. The Company also owns, controls and holds with power to vote more than 60 per cent of the outstanding voting securities of General Public Utilities, Inc., a Florida corporation with its principal executive offices in Jersey City, N. J. The latter is not only a public utility company but is also a holding company since it owns, controls and holds with power to vote all of the voting securities of the following public utility companies: Dakota Power Company, Gothenberg Light and Power Company, Gulf Public Service Company, Nebraska Light and Power Company, Southwestern Public Service Company, Arizona Electric Power Company, Flagstaff Electric Light Company and Holbrook Light and Power Company.

The public utility companies in the Company's holding company system operate in the states of Kansas, Missouri, Arkansas, Texas, New Mexico, South Dakota, Nebraska, Louisiana and Arizona.

On December 1, 1935, the Company registered with the Commission under Section 5 of the Act, 15 U.S.C.A. § 79e, and thereby became a "registered holding company" as that term is used in Section 11(e) thereof.

On or about January 13, 1938, the Company filed with the Securities and Exchange Commission an application under the Act for a report on a Plan of Recapitalization to modify its capital structure, adjust arrearages in preferred stock dividends, and reduce preferred dividend requirements. Hearings were had on said Plan before an officer of the Securities and Exchange Commission on February 23 and 24, 1938. Subsequent to said hearings, but prior to any determination by the Securities and Exchange Commission with respect to said Plan of Recapitalization, the Company filed certain amendments thereto and hearings were again held on said Plan, as so amended, on March 13, 14, 15 and 16, 1939. Subsequent to said hearings, but prior to any determination by the Se-

curities and Exchange Commission with respect to said Plan as so amended, the Company filed an application pursuant to Section 11(e) of the Act asking the Commission to approve a Plan of Corporate Simplification (hereinafter called the "Plan") as fair and equitable and necessary to effectuate the provisions of Section 11 (b) of the Act.

The Commission on August 7, 1939, issued a Notice of and Order for Hearing with regard to such Plan, which notice was published in the Federal Register on August 9, 1939, and the Company sent by mail, to each of its security holders a copy of a notice, which set forth details of the Plan and the date and place of the hearing to be held with regard to such Plan.

On September 6, 1939, a hearing on the Plan was held pursuant to such notice before a duly appointed officer of the Commission. At such hearing the Company appeared and presented evidence in support of the fairness of the Plan. No security holder or other person appeared at such hearing in opposition to the Plan.

On November 18, 1939, the Commission approved the Plan and entered its Findings and Opinion and Order. At the same time, the Commission issued its report on the Plan as requested by the Company. This report was sent to the Preferred and Common stockholders in connection with the solicitation of assents to the Plan. Thereafter, the Company gave notice to and solicited proxies of the Common and Preferred stockholders for a stockholders' meeting which was held in Wilmington, Delaware, on January 12, 1940. At this meeting the Plan was approved by more than two-thirds of the Preferred stockholders and by more than a majority of the Common stockholders. Certain of the minority stockholders, both Preferred and Common, objected to the Plan and voted against its approval.

On or about March 18, 1940, the Commission, at the request of the Company, made an application to this Court, pursuant to the provisions of Section 11(e) of the Act, to enforce and carry out the terms and provisions of the Plan.

On March 18, 1940, this Court made its order which brought on the hearing of this application on April 25, 1940. Notice of this proceeding, in the manner directed in said order, was given to those security holders of the Company whom the Plan affects. H. Vincent Smart, Esq., represent-

ing 112 shares of Common stock of the Company, appeared on the return day and an adjournment was taken to May 11, 1940, to enable him to file a memorandum regarding the constitutionality of the Public Utility Holding Company Act, and to cross examine such officers of the Company as he might give notice to the Company, on or before May 5, 1940, to produce on the adjourned date. Mr. Smart notified the Court on May 1, 1940, that his client desired him to withdraw from the proceeding, but he submitted, nevertheless, a memorandum upon the law, together with a communication prepared by a person connected with his client, containing his comments upon the alleged unfairness of the Plan and the enforcement thereof.

There was also informally presented to the Court, prior to May, 1, 1940, a request from the Attorney General of the State of Delaware for an adjournment to enable him to determine whether he would seek permission to intervene. Before said adjourned date the Court was advised informally that he did not intend to do so. A letter was also presented, at the adjourned hearing on May 11, 1940, from Howard Duane, Esq., of Wilmington, Delaware, advising that he had been retained by a holder, since 1930, of 340 shares of First Preferred Stock, $6 Dividend Series of the Company, and that an action had been brought by him, subsequent to the institution of this proceeding, in a Court of Chancery of the State of Delaware in and for Newcastle County upon a bill for an injunction, which apparently is still pending, a motion to restrain and for a temporary injunction pendente lite, however, having heretofore been denied.

█ While, as has been stated, no one appeared in opposition to this application, the Court cannot, and will not, ignore its responsibility to pass upon the objections which have been suggested by counsel who appeared and then withdrew from this proceeding.

Section 11(b) of the Act, so far as pertinent, provides:

"It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

\* \* \*

"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system. \* \* \*"

Section 11(e) of the Act provides in part: "If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18 [79r of this chapter], to enforce and carry out the terms and provisions of such plan."

█ Section 24 of the Act, Title 15 U. S.C.A. § 79x, provides that any person or party aggrieved by an order issued by the Commission may obtain a review upon petition to the Court of Appeals of the United States within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia. Such appeal must be taken within 60 days after the entry of such order. No such appeal has been taken and the time so to do has long since expired.

Subsection (f) of Section 18, Title 15 U.S.C.A. § 79r (f), reads as follows: "Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title [chapter], or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, the Supreme Court of the District of Columbia, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this title [chapter] or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discre-

tion, may institute the appropriate criminal proceedings under this title [chapter]."

The authority of the Court under this section to approve the Plan in accordance with subsection (f) is challenged but it would certainly defeat the intent of the Congress and the purpose of the Act if the Court lacks such power in view of the express language of Section 11(e) which reads: "If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of Section 11 [this section], the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed."

The officers of the Company, because of the pending suit in the Chancery Court of Delaware, might refrain from carrying out the Plan without such a protective order as here applied for and of course the purpose of the Plan approved by the Commission would thereby be defeated and the assets of the Company possibly depreciated, if not, wasted.

But Section 25 of the Act, Title 15 U.S. C.A. Sec. 79y, providing for jurisdiction of offenses and suits, provides in part: "Any suit or action to enforce any liability or duty created by, or to enjoin any violation of, this title [chapter] or rules, regulations, or orders thereunder, may be brought in any such district or in the district wherein the defendant is an inhabitant or transacts business * * *. Judg-, ments and decrees so rendered shall be subject to review as provided in sections 128 and 240 of the Judicial Code, as amended [U.S.C.A. Title 28, Sections 225 and 347]".

By the term of the Plan itself its effectiveness is dependent upon approval by a Federal Court as well as the Commission.

Consequently I hold that this Court has jurisdiction of the Company and the subject matter.

I am further persuaded to this determination by an examination of the Report of the Senate Committee on Interstate Commerce, No. 621, 74th Congress, First Session.

### The Plan

The Plan contemplates the exchange of all of the Preferred and Common Stock of the Company now outstanding for New Common Stock. Each share of present Preferred Stock, together with all accumulated unpaid dividends, will receive five shares of New Common Stock. Each share of present Common Stock will receive one and four-fifths shares of New Common Stock. The new shares of Common Stock are to have a par value of $10 each and will be entitled to one vote per share.

Upon carrying out the proposed Plan, the resulting distribution of New Common Stock will be as follows:

| | Shares | Per Cent |
|---|---|---|
| To present Preferred stockholders (5 new shares for each of 68,962 present shares) | 344,810 | 95.04 |
| To present Common stockholders (1⅘ new shares for each of 10,000 present shares) | 18,000 | 4.96 |
| | 362,810 | 100.00 |

The Plan also provides that the "Assignments and Agreements" now outstanding in the face amount of $370,523.84, may be redeemed by the Company at any time upon thirty days notice and upon payment at the rate of $100 for each $95 face amount outstanding.

In connection with the consummation of the Plan, the Company proposes to make various accounting entries which will have the effect of adjusting or eliminating certain accounts in the Company's balance sheet. These accounting entries are in accordance with the Securities and Exchange Commission's Uniform System of Accounts for Public Utility Holding Companies; certain of the entries are required by the Uniform System, and the others are within the Company's discretion.

The Plan, by its terms, is to become effective if it secures not only the approval of the Securities and Exchange Commission, but also that of the holders of two-

thirds of the Preferred and a majority of the Common Stock, and of a Federal Court upon application by the Securities and Exchange Commission pursuant to Section 11(e) of the Act.

The contemplated procedure is as follows: If the approval of the Securities and Exchange Commission is secured, the Plan will be submitted for the consideration of the stockholders. If approval is given by the specified majorities, the Commission is requested to apply to a Federal Court to enforce and carry out the terms and provisions of the Plan. If the Plan is then approved by the Court, it is to be consummated either (a) by amending the charter of the existing corporation, or (b) by organization of a new corporation which will take over all of the assets and assume all of the liabilities and obligations of the existing corporation.

In the event that the existing corporation is to be used in the consummation of the proposed Plan, the present certificate of incorporation will be so amended as to eliminate all provisions relating to the presently authorized and outstanding First Preferred and Common Stock and so as to authorize the issuance of 500,000 shares of New Common Stock, each share having one vote and having a par value of $10.

In the event that the proposed Plan is consummated by the formation of a new corporation, such new corporation will be organized under the laws of Delaware or such other state as may be determined by the board of directors. It will have powers and purposes substantially similar to those possessed by the present corporation. The new corporation will have an authorized capital consisting of 500,000 shares of Common Stock, each share having one vote and having a par value of $10. Following the formation of such new corporation, all of the property now owned by Community Power and Light Company will be sold, transferred and assigned to the new corporation, which will at the same time assume all of the liabilities and obligations of the present company in return for such an amount of common stock of the new company as will be necessary to consummate the proposed Plan. This Common stock will then be distributed in accordance with the provisions of the Plan.

### Questions Presented by the Plan

In order to approve the Plan the Act requires the Commission to find that the Plan is necessary to effectuate the provisions of subsection (b) of Section 11, which in turn requires it to find that the present corporate structure of the Company is such that the Commission must take steps to insure that the Company's corporate structure will not unduly or unnecessarily complicate the structure of the holding-company system and to insure that the voting power is not unfairly or inequitably distributed among security holders, and that the Plan is fair and equitable to the persons affected by it.

All of the proceedings before the Commission were introduced upon the hearing before, and received in evidence by me.

In the Findings and Opinion of the Commission it found:

1. That the corporate structure of the Company was unduly and unnecessarily complicated and that the complications in the corporate structure of the Company rendered the corporate structure of the holding company system, of which the Company is a part, unduly and unnecessarily complicated, contrary to the standards of Section 11(b) of the Act;

2. That the voting power was unfairly and inequitably distributed;

3. That the Plan was necessary to effectuate the provisions of subsection (b) (2) of Section 11 of the Act;

4. That the modification in the terms of the Assignments and Agreements was necessary to eliminate complications in the Company's corporate structure;

5. That the Plan was fair and equitable to both classes of stockholders;

6. That the modification in the terms of the Assignments and Agreements was fair to the holders thereof, and

7. That there was nothing in the proposed accounting transactions tending to make the Plan unfair or not in compliance with the Act.

### Present Financial Condition of the Company

Since 1931, the Company and its subsidiaries, including General Public Utilities, Inc., have been short of working capital. Such cash as the system had was used to pay principal and interest on certain bank loans, interest on the Assignments and Agreements, and for construction purposes and hence could not be used for dividends on the Preferred Stock. As the dividends on the Preferred Stock ac-

cumulated it became more difficult for the Company or its subsidiaries to sell securities to obtain the much needed additional capital.

From 1927 to 1931, the Company paid regular dividends on its Preferred and Common Stocks.

In every year from 1927 to 1930, the dividends paid exceeded the amounts earned.

In the period from 1932 to 1938, inclusive, the total net cash in the system, not including General Public Utilities, Inc., amounted to approximately $5,054,608, and in the same period the following disbursements were made: (1) Payments of principal on bank debt, $1,775,000; (2) interest on bank debt, $337,782; (3) interest on Assignments and Agreements, $294,704; (4) Construction, $2,928,341; or a total of $5,335,627, leaving a cash deficit for the period of $281,219.

The bank loan, which cost the Company more than $2,100,000 from 1931 to 1938 in principal and interest, was originally incurred by the Company at the instance of its then parent company, American Community Power Company (Hereinafter called "American").

On September 8, 1931, the American, which then controlled the Company, caused it to issue a six per cent Demand Note in the amount of $1,500,000 in consideration of the payment of $500,000 in cash by American to the Company and the assignment to the Company of a note in the face amount of $1,000,000, payable to American by General Public Utilities, Inc.'s predecessor.

As of the same date, American borrowed $1,500,000 from The Chase National Bank of The City of New York (hereinafter called "Chase") and executed and delivered a six per cent collateral note for six months in that amount. As security, American turned over to Chase, the Company's note to it for $1,500,000 and, as additional collateral, American Commonwealths Power Corporation (Del.), the parent of American (hereinafter called "Commonwealths"), deposited 50,000 shares of the common stock of American, which was all of that Company's outstanding stock.

As a part of the transaction, it was agreed by American that its note to Chase would mature upon (1) the non-payment of an $1,800,000 issue of notes of American, which were due November 1, 1931, or (2) upon the non-payment of the $4,000,000 issue of Secured Notes of General Public Utilities, Inc.'s predecessor, due December 1, 1931.

Neither of these obligations was paid at maturity.

To obtain a waiver from Chase of default on American's note it caused the Company to pledge additional collateral as security for its note. The additional collateral so pledged was all of the common stock of the predecessor of Texas-New Mexico Utilities Company and $1,800,000 of notes of General Public Utilities, Inc.'s predecessor.

Receivers were appointed for American by the Chancery Court of Delaware on Dec. 31, 1931, and on Feb. 15, 1932, the Company executed a Collateral Agreement with Chase under the terms of which the note of the Company was extended to May 1, 1932, and the Company recognized Chase as the holder of its note in due course and agreed to pay interest and principal of such note when due.

The note to Chase was finally liquidated, after periodic extensions, on March 27, 1936, as a result of funds borrowed from the Empire Trust Company and from the Continental Bank & Trust Company, both of New York City. The principal of the notes to these two banks was reduced until as of June 30, 1939 only $150,000 was due to the Continental Bank & Trust Company. This has now been paid from the proceeds of a loan secured from the Reconstruction Finance Corporation.

Because of the conduct of its former parent companies, the Company was also required to issue certain "Assignments and Agreements" although it received no cash return therefrom.

During 1931, Commonwealths caused employees and officers of the operating subsidiaries of the Company to sell shares of its $6.24 Preferred Stock and shares of the Prior Preferred Stock of American Commonwealths Power Corporation, New Jersey, in the territory served by such operating subsidiaries. None of the proceeds of these sales went to the Company or to any of its subsidiaries.

In order to avoid litigation and retain the good will of the customers of their subsidiaries, the Company offered to take up the Preferred Stock that had been so sold at the instance of Commonwealths (Del.). This transaction was evidenced

by an assignment to the Company of any claim which such Preferred stockholders of Commonwealths (N. J.) may have had in the premises. In turn, the Company agreed to pay to the holder of such Preferred stock $6.24 per annum for each $100 face amount of Prior Preferred Stock (which had been sold for $95). These obligations have no due date, but are exchangeable at the option of the Company for its junior Preferred stock, provided there are no arrears of dividends on the First Preferred Stock. The Company has never, because of said dividend arrears, been in a position to exercise its right to issue Preferred stock in settlement of these Agreements.

During the period from 1931 to 1938, the interest on the Assignments and Agreements amounted to $294,704. This amount was paid by the Company with no cash return to it and to that extent utilized cash which would otherwise have been available for dividends on the First Preferred Stock.

It appears that the cash entering the system through normal business operations was not sufficient to meet the cash requirements of the system, including construction. During the same period it has been impossible for the subsidiary companies to take care of their own construction for additions and extensions through the sale of new securities.

The Trust Indenture, under which the $14,000,000 principal amount of the Company's First Mortgage Collateral Trust Gold Bonds are issued, provides that all securities of the direct operating subsidiaries owned by the Company are to be pledged with the Trustees. The Company covenanted that it would not permit the subsidiaries to issue any additional securities unless such securities were also pledged with the Trustees. This provision prevented sale of securities to anyone except the Company and that company was not in a cash position to put any additional money in the operating properties.

General Public Utilities, Inc., has a similar provision in the Trust Indenture securing its First Mortgage and Collateral Trust 6½% Bonds. Its subsidiaries are thus unable to sell securities to finance their own extensions and additions. General Public Utilities, Inc. is not in a cash position to put additional funds into its subsidiaries, and, as has been stated, the Company cannot advance money to General Public Utilities, Inc., so that company may aid its subsidiaries.

Temporary respite from this situation was secured by the Company in May, 1939, through the medium of a Reconstruction Finance Corporation loan of $1,350,000. Of this amount, $1,250,000 is to be used by the Missouri Utilities Company, The Kansas Utilities Company, and the Texas-New Mexico Utilities Company for construction of additions and extensions in the territory served by such companies. The remaining $100,000 to be used by the Company, together with funds of its own, to pay off the bank loans previously mentioned.

Under the terms of the loan agreement the Company is presently restricted while the loan is outstanding to a maximum annual dividend of 50 cents per share on the New Common Stock, or a total annual dividend payment of not over $181,405.

### Fairness of the Plan

The Commission found that:

"The most obvious question of fairness is the allocation of securities between the present Preferred and Common stockholders. Unless their present interests in the Company correspond to the proposed 95 to 5 distribution, the plan may be said to be unfair in the absence of offsetting considerations. On the other hand, it is to be recognized that such relationships cannot be measured with precision.

"The usual methods for determining the fairness of a reallocation of securities require consideration of the values presently available for each class. On the basis of book values, as determined by the latest balance sheet, there would appear to be an excess of value available for the Common Stock, which might be used as a basis for some recognition. However, as pointed out above, values on the balance sheet include items which ought not to be there and which it is now proposed to eliminate. When these eliminations are made, the margin apparently available for the Common Stock disappears.

"This, however, is not conclusive as to the right of the Common Stock to participation. At the present time the corporate earnings exceed the Preferred dividend requirement and the forecasts of future earnings point to a still further improvement. It may be assumed, therefore, that although it will take many years before the present Common Stock can hope for a return, es-

pecially in view of the crippling effect of the present capital structure, nevertheless there is an eventual prospect which must be regarded as having a present value. If the company were in a position to pay out all of its corporate net income in the form of dividends, the Common stockholders might, on the basis of the present level of earnings, expect some return after approximately 10 years. However, according to the Company's management the system must conserve its cash for improvements, replacements, and betterments, and as pointed out above, the loan agreement with the Reconstruction Finance Corporation limits dividend payments so long as that loan is outstanding unless that corporation's consent is obtained to any proposed increase in dividend payments. Nevertheless, the possibility that there may eventually be dividends available for the Common Stock is such that we cannot say that the Common Stock has no value, and we therefore believe that it is entitled to some participation in the Company.

"We have frequently said that for reorganization purposes earning power rather than the book value of assets is the best test of value. Genesee Valley Gas Co., Inc., 3 S.E.C. 104 (1938); In re Utilities Power & Light Corp., 1939, D.C., 29 F. Supp. 763, 5 S.E.C. 483. In the present case it is unnecessary to attempt to appraise the exact value of the Common Stock of Community. It is evident from the income figures, as previously act forth above, that there is some excess of earnings over present Preferred dividend requirements. We therefore believe that some value remains for the Common Stock. Under circumstances where a larger participation was being given to Common Stock, we might be required to evaluate more precisely the equity for such common stock. On the other hand, the fact that there appears to be no prospect of dividends being paid on the Common Stock for many years indicates that any participation being given to that class of stock must necessarily be slight. Under all the circumstances of the present case and upon consideration of the entire record, we are of the opinion that the proposed allocation is reasonable.

"It may be argued that whatever value exists for the Common Stock is presently subordinated to the claims of the Preferred stockholders, whereas the plan proposes to place both on a parity so far as the future is concerned. In the present case such a contention seems unreal. Any attempt to give the Preferred stockholders for their overwhelming interest securities senior in rank to those issued to the holders of Common Stock would produce a useless complexity without substantially affecting the result. The interest of the present Common stockholders is so small as in no event to warrant the issuance of more than one class of securities.

"It follows from the foregoing that the vesting of the Preferred stockholders with 95% of the voting power is consistent with the respective interests of the two classes of stock and we find the plan fair and equitable to both classes of stockholders.

"As we have pointed out, the modification in the terms of the Assignments and Agreements is in substance merely incidental to the simplification of the Company's corporate structure. Since no real change is made in the rights of the holders of Assignments and Agreements; and since they will continue to receive interest at the same rate unless and until the Company is able to redeem their securities at the full price, we find that the proposed alteration in the terms of these documents is fair to the holders thereof."

### Necessity for Plan

The Commission found:

"With huge Preferred Stock arrearages which, because of the terms of the Reconstruction Finance Corporation's loan heretofore mentioned, will increase for the present rather than diminish, and in view of the fact that the Assignments and Agreements now outstanding cannot be called unless converted into junior preferred stock, which cannot be issued so long as Preferred dividends are in arrears, we are of the opinion that the Company's corporate structure is unduly and unnecessarily complicated. Under these circumstances, we are of the opinion that the complications in Community's corporate structure render the corporate structure of the holding company system of which Community is a part unduly and unnecessarily complicated, contrary to the standards of Section 11(b).

"We reach the same conclusion with respect to the distribution of voting power. As already stated, under the terms of the charter the holders of Common Stock are in a position to control the Company at all times and, in the absence of defaults, have the sole voting power for the election

of directors. The fact is that the interest of the Common Stock in the Company's assets and earnings is at best slight. In substance the Company belongs to the Preferred stockholders, assuming that its creditors are secure in their claims. We therefore conclude, and so find, that the voting power is presently unfairly and inequitably distributed.

"The proposed modification in the terms of the Assignments and Agreements is merely an incident to the transformation of the Company's corporate structure from three authorized classes to one class of stock. Under the present terms of the Assignments and Agreements, they may be converted into a junior preferred stock 'if and when defaults in preferred dividends have been remedied and regular preferred dividends have been resumed.' Since the consummation of the simplification plan will terminate all rights to accrued dividends, it is evident that the Company, upon the exchange of stock required by the plan, would, so far as the terms of the Assignments and Agreements are concerned, be in a position to convert the Assignments and Agreements into preferred stock and then immediately to call such preferred stock at its call price of $100 per unit. The effect of the proposed modification, therefore, appears merely to make unnecessary the actual issuance and calling of the junior preferred stock. In that way the additional complication in the corporate structure resulting from such issuance is avoided. No real change is made in the rights of the holders of Assignments and Agreements. So far as any alteration is made requiring our approval, therefore, we find that such modification in the terms of the Assignments and Agreements is necessary to eliminate complications in the Company's corporate structure and to carry out the original purposes of the Assignments and Agreements in the light of the elimination of the Company's Preferred Stock and its transformation into a one stock company.

"Under all of the circumstances of this case, in the light of the Company's present financial condition and future prospects, and in view of the present inequitable distribution of voting power, we conclude and so find that the plan of corporate simplification is necessary to effectuate the provisions of subsection (b) (2) of Section 11."

It has been suggested to the Court, as previously stated, that Section 11 of the Act is not an exercise of the Congressional power over Interstate Commerce in that "the test of application * * * is not whether the holding company is engaged in or affects interstate commerce but rests solely on the test of whether it is a holding company."

This suggestion is without merit. Section 11 does not apply to all holding companies. It is expressly limited in its application to "registered" holding companies under Section 5 of the Act. Nor is registration required indiscriminately of all holding companies as such. On the contrary, registration is obligatory only for those holding companies which engage in certain specified types of transactions.

Section 4(a) of the Act 15 U.S.C.A. § 79d(a), reads:

"After December 1, 1935, unless a holding company is registered under section 5 [79e of this title], it shall be unlawful for such holding company, directly or indirectly—

"(1) to sell, transport, transmit, or distribute, or own or operate any utility assets for the transportation, transmission, or distribution of, natural or manufactured gas or electric energy in interstate commerce;

"(2) by use of the mails or any means or instrumentality of interstate commerce, to negotiate, enter into, or take any step in the performance of, any service, sales, or construction contract undertaking to perform services or construction work for, or sell goods to, any public-utility company or holding company;

"(3) to distribute or make any public offering for sale or exchange of any security of such holding company, any subsidiary company or affiliate of such holding company, any public-utility company, or any holding company, by use of the mails or any means or instrumentality of interstate commerce, or to sell any such security having reason to believe that such security, by use of the mails or any means or instrumentality of interstate commerce, will be distributed or made the subject of a public offering;

"(4) by use of the mails or any means or instrumentality of interstate commerce, to acquire or negotiate for the acquisition of any security or utility assets of any subsidiary company or affiliate of such holding company, any public-utility company, or any holding company;

"(5) to engage in any business in interstate commerce; or

"(6) to own, control, or hold with power to vote, any security of any subsidiary company thereof that does any of the acts enumerated in paragraphs (1) to (5), inclusive, of this subsection."

In Electric Bond & Share Co. v. Securities & Exchange Commission, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105, the Court sustained Sections 4(a) and 5 of the Act as constitutional and held that the doing of any of the things specified in clauses (1) to (6) of Section 4(a) above quoted constituted an engagement in interstate commerce subject to the regulation of Congress. Therefore, the only holding companies required to register are those which engage in interstate commerce. Since Section 11 by its terms applies only to registered holding companies, it is evident that "the test of application" does not "rest solely on * * * whether the Company is a holding company" without regard to whether it is "engaged in or affects interstate commerce."

■ The further suggestion has been made to the Court that, despite its registration under Section 5 of the Act, the Company is not subject to regulation by Congress under the commerce clause because it "is simply a holding company collecting dividends and interest from its investments, in no reasonable sense, engaged in interstate commerce". But in view of the regulatory provisions of the Act which take effect only after registration it would seem unlikely that the officers and directors of the Company would have caused it to register under Section 5 of the Act unless the Company engaged in interstate commerce as defined in clauses (1) to (6) of Section 4(a).

However that may be, the record is clear that at least three subsidiaries of the Company transmit, and own and operate utility assets for the transmission of electric energy in interstate commerce, within the meaning of clause (1) of Section 4(a) of the Act. These are Texas-New Mexico Utilities Company, Kansas Utilities Company and Missouri Utilities Company, all of whose outstanding voting securities are owned, or controlled and held by the Company with power to vote. That the interstate commerce is conducted through the subsidiary companies rather than by the Company itself is of no moment. In Electric Bond & Share Co. v. Securities & Exchange Commission, supra, Mr. Chief Justice Hughes said (303 U.S. at page 440, 58 S.Ct. at page 686, 82 L.Ed. 936, 115 A.L.R. 105): " * * * That they conduct such transactions through the instrumentality of subsidiaries cannot avail to remove them from the reach of the federal power. It is the substance of what they do, and not the form in which they clothe their transactions, which must afford the test. The constitutional authority confided to Congress could not be maintained if it were deemed to depend upon * * * mere modal arrangements * * *."

I deem the second suggestion to be without merit.

■ The suggestion was further made that Section 11 of the Act is not within "the power of Congress to pass uniform laws on bankruptcy * * * (or) * * * to establish post offices and post roads."

Reliance is placed by both suggestors on Burco, Inc. v. Whitworth, 4 Cir., 1936, 81 F.2d 721. That case arose upon an application for instructions by a trustee appointed under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The debtor was a holding company as defined by the Act and the question was whether the trustee should comply with the registration provisions of Sections 4(a) and 5. The Court held that those sections were unconstitutional and directed the trustee to disregard them. That decision has been clearly overruled by the later determination of the Supreme Court in the Electric Bond & Share Co. Case, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105, that Sections 4(a) and 5 are constitutional. The Court in the Burco case, however, unlike the Supreme Court in the Electric Bond & Share Co. case, gave expression to opinions concerning sections of the Act other than those in issue. This, of course, is sheer obiter. In view of the fact that the Burco case has been overruled as to the matter decided, little weight can be given to its dicta.

The Company is engaged in interstate commerce through the instrumentality of its subsidiaries and the application of subsection (b) (2) and (e) of Section 11 are clearly within the power of Congress under the commerce clause.

■ The power of Congress over interstate commerce is, subject to the limitations of the Bill of Rights, plenary and sovereign

(Kentucky Whip & Collar Co. v. Illinois Central Railroad ·Co., 1937, 299 U.S. 334, 345, 57 S.Ct. 277, 81 L.Ed. 270; Champion v. Ames, 1903, 188 U.S. 321, 347, 352, 23 S.Ct. 321, 47 L.Ed. 492; Gilman v. Philadelphia, 1865, 3 Wall. 713, 725, 18 L.Ed. 96; Gibbons v. Ogden, 1824, 9 Wheat. 1, 196, 6 L.Ed. 23; Cohens v. Virginia, 1821, 6 Wheat. 264, 412, 5 L.Ed. 257) and is not limited to such commerce itself but extends "to every instrumentality or agency by which it is carried on" (Minnesota Rate Cases, 1913, 230 U.S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18) and to the "persons engaged in it." Sherlock v. Alling, 1876, 93 U.S. 99, 103, 23 L.Ed. 819.

■ Within the field of interstate commerce Congress possesses a police power to promote the general welfare akin to that of the states in the realm of their domestic affairs. Nebbia v. New York, 1934, 291 U.S. 502, 524, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Brooks v. United States, 1925, 267 U.S. 432, 436, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407.; Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 41, 43 S.Ct. 470, 67 L.Ed. 839.

■ Congress may, therefore, under the commerce clause, enact legislation "to foster, protect and control [interstate] commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety." Dayton-Goose Creek R. Co. v. United States, 1924, 263 U.S. 456, 478, 44 S.Ct. 169, 172, 68 L.Ed. 388, 33 A.L.R. 472. It is within the province of Congress, moreover, in the regulation of interstate commerce to provide for the security of the people in their relationships to corporations engaged ·in such commerce. Thus in Crutcher v. Kentucky, 1891, 141 U.S. 47, 58, 11 S.Ct. 851, 854, 35 L.Ed. 649, the Court said: " * * * The prerogative, the responsibility, and the duty of providing for the security of the citizens and the people of. the United States in relation to foreign corporate bodies or foreign individuals with whom they may have relations of foreign commerce, belong to the government of the United States * * *. And the same thing is exactly as true with regard to interstate commerce as it is with regard to foreign commerce. No difference is perceivable between the two. * * *"

The powers of Congress in this regard were succinctly stated by the late Frank B. Kellogg some thirty years ago: " * * * Within its power of regulation it may prescribe what corporations may so engage in such commerce. It may prohibit corporations organized under foreign governments from engaging therein, or prescribe the regulations under which they may so engage. It may equally prohibit state corporations from so engaging, or as a condition prescribe the regulations under which they may engage. Such conditions may include the terms under which the capital stock shall be issued and paid for, and proper guaranties to insure the solvency of such corporations, to the end that their securities may be safe investments for the people, and that they may be able to perform their obligations as instrumentalities of commerce." Federal Incorporation and Control, 20 Yale L.J. 177, 188 (1910).

Similarly Victor Morawetz, an eminent authority on constitutional and corporate law, wrote over a quarter of a century ago: " * * * The organization, powers, and financial conditions of a * * * corporation may have a direct and important relation to the transaction of interstate and international commerce, and may be of such a character as to render the * * * operations of the corporation a menace to the security and welfare of the people of all the states. A statute prohibiting the transaction of interstate commerce by means of a corporate organization which is a menace to the security of the public would seem justifiable as an exercise of the police power over interstate commerce and as a regulation of such commerce within the meaning of the Constitution." The Power of Congress to Enact Incorporation Laws and to Regulate Corporations, 26 Harv.L.Rev. 667, 680 (1913).

Subsections (b) (2) and (e) of Section 11 of the Act are clearly within the power of Congress above described. A corporation engaged in interstate commerce whose corporate structure is unduly or unnecessarily complicated or unfairly and inequitably distributes voting power among its security holders is manifestly inimical both to that commerce and its own security holders. That is especially so of public utility holding companies one of whose main functions is to finance the operations of their subsidiaries through funds raised by the sale of their own securities.

■ The suggestion that, in providing a ·means of corporate simplification for registered holding companies, the Act is

arbitrary and capricious is demonstrably unwarranted.

The suggestion that the plan is not within Section 11 (b) (2) in that the corporate structure of the Company is not complicated and does not unfairly and inequitably distribute voting rights is equally untenable. It appears clearly from the opinion of the Commission approving the plan that, although there have been earnings, dividends have not been declared since November 1931 because the funds were found necessary to meet debt obligations and to pay for necessary improvements to the properties of the operating subsidiaries. With huge arrearages of unpaid and undeclared dividends on the Preferred Stock, the Company finds itself without credit to raise the funds necessary to enable it to fulfill its duties to its subsidiaries. The "Assignments and Agreements" being without maturity, constitute perpetual debentures, which, unless the Plan is consummated or the arrearages on the Preferred Stock are somehow paid, cannot but contribute to the inability of the Company to function normally.

Complexity is not a matter to be determined merely by counting the classes of securities outstanding. A corporate structure is unduly and unnecessarily complicated when it prevents the corporation involved from performing its functions. By such a test there can be no doubt that the Company's corporate structure falls within the meaning of Section 11(b) (2) of the Act.

That the voting rights are unfairly distributed is apparent. The Commission found the 10,000 shares of outstanding Common Stock to be valueless on the basis of adjusted book-value, and on an earning basis to have but a 5 per cent interest in the Company. Yet this class of stock presently controls the Company through a preponderance of voting strength.

It has been further suggested that in their application in the instant case subsections (b) (2) and (e) of Section 11 are unconstitutional in that they would abrogate "vested contractual rights given * * * by state law." I do not agree. In the exercise of its powers under the Constitution, Congress may properly enact legislation which has the effect of impairing or even abrogating existing contract rights. This has been recognized on numerous occasions by the Supreme Court in sustaining statutes enacted under the power to coin money and regulate its value. Legal Tender Cases, 1870, 12 Wall. 457, 549, 550, 20 L.Ed. 287; Norman v. Baltimore & Ohio R. Co. (Gold Clause Case), 1935, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, as well as under the commerce clause, United States v. Southern Pac. Co., 1922, 259 U.S. 214, 234, 42 S.Ct. 496, 66 L.Ed. 907; New York v. United States, 1922, 257 U.S. 591, 600, 601, 42 S.Ct. 239, 66 L.Ed. 385; Philadelphia, etc., R. Co. v. Schubert, 1912, 224 U.S. 603, 613, 32 S.Ct. 589, 56 L.Ed. 911; Louisville & N. R. Co. v. Mottley, 1911, 219 U.S. 467, 480-482, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S., 671; Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 226-235, 20 S.Ct. 96, 44 L.Ed. 136. Thus in the Schubert case, supra, Mr. Justice Hughes, as he then was, said (224 U.S. at page 613, 614, 32 S.Ct. at page 592, 56 L.Ed. 911): " * * * The power of Congress, in its regulation of interstate commerce * * * [is] not fettered by the necessity of maintaining existing arrangements and stipulations which * * * conflict with the execution of its policy. To subordinate the exercise of the Federal authority to the continuing operation of previous contracts would be to place, to this extent, the regulation of interstate commerce in the hands of private individuals, and to withdraw from the control of Congress so much of the field as they might choose by prophetic discernment to bring within the range of their agreements. The Constitution recognizes no such limitation. It is of the essence of the delegated power of regulation that, within its sphere, Congress should be able to establish uniform rules, immediately obligatory, which as to future action should transcend all inconsistent provisions. Prior arrangements were necessarily subject to this paramount authority."

Nor is the suggestion that Sections 11(b) (2) and 11(e) of the Act in their present application violate the Tenth Amendment of any merit. Assuming that Delaware law prohibits its corporations from amending their charters so as to substitute some other right for that of Preferred shareholders to accrued unpaid and undeclared dividends: Congress is not fettered in the regulation of the instrumentalities of interstate commerce by state law. United States v. Delaware & Hudson Co., 1909, 213 U.S. 366, 405, 29 S.Ct. 527, 53 L.Ed. 836; Northern Securities Co.

v. United States, 1904, 193 U.S. 197, 345, 24 S.Ct. 436, 48 L.Ed. 679; Pittsburgh & W. V. R. Co. v. Interstate Commerce Commission, 1923, 54 App.D.C. 34, 293 F. 1001, 1003, appeal denied, 1924, 266 U.S. 640, 45 S.Ct. 124, 69 L.Ed. 483. Thus in the Delaware & Hudson case, supra, the Court said (213 U.S. at page 405, 29 S.Ct. at page 535, 53 L.Ed. 836): "* * * The power to regulate commerce possessed by Congress is, in the nature of things, ever-enduring, and therefore the right to exert it to-day, tomorrow, and at all times in its plenitude must remain free from restrictions and limitations arising or asserted to arise by state laws, whether enacted before or after Congress has chosen to exert and apply its lawful power to regulate."

In the Pittsburgh & W. V. R. Co. case, supra, the Court sustained Section 20(a) of the Interstate Commerce Act, 49 U.S.C.A. § 20(a), which placed the issuance of securities by transportation companies engaged in interstate commerce under the regulation of the Interstate Commerce Commission. In overruling a contention similar to that here raised, the Court said (54 App.D.C. 34, 293 F. at page 1003): "The validity of section 20a, supra, is questioned on the ground that it is not a regulation of Interstate Commerce, nor within the power of Congress, but is instead a usurpation of states' rights contrary to the Tenth Amendment of the Constitution of the United States. It is authoritatively asserted that with one or two exceptions all the railroad corporations of the country are organized under state laws, and it is contended are subject exclusively to the constitution and laws of the states in which they were created. We are not impressed by this contention. Unquestionably every state has plenary power over its corporations, but when that power comes in conflict with the exercise by Congress of a power expressly conferred by the Constitution, the authority of the state must yield. We are here considering the power of Congress to regulate interstate commerce; in that field the authority of Congress is supreme. A law of Congress enacted pursuant to express constitutional sanction, is the supreme law of the land, 'anything in the Constitution or laws of any state to the contrary notwithstanding.'"

The Court said in Champion v. Ames, 1903, 188 U.S. 321, 357, 23 S.Ct. 321, 327, 47 L.Ed. 492: "If it be said that the act * * * is inconsistent with the Tenth Amendment, reserving to the States respectively or to the people the powers not delegated to the United States, the answer is that the power to regulate commerce among the States has been expressly delegated to Congress."

But the Delaware law is not as has been suggested. All that Keller v. Wilson & Co., Del.Sup., 1936, 190 A. 115, and the cases that follow it (relied upon by Mr. Duane) hold is that accumulated unpaid and undeclared dividends are not subject to elimination by action of the stockholders under Section 26 of Delaware's General Corporation Law. This is apparent from the later decision of the same court in Federal United Corporation v. Havender, Del.Sup., 1940, 11 A.2d 331, holding that such dividends can properly be eliminated by corporate action under Sections 59 and 59A of the General Corporation Law.

The Keller case, supra, turns upon the point that Section 26 of the General Corporation Law was not in effect when the corporation in question was organized and that consequently rights of preferred shareholders contracted before its enactment were not subject to impairment by it. Consolidated Film Industries v. Johnson, Del. Sup., 1937, 197 A. 489, goes a step further. It was there held that even as to corporations organized after its enactment, Section 26, while effectively creating means to bar the cumulation of future dividends, could not be used to affect dividends already accrued without impairing the obligation of contract. These cases, of course, are based on the provision of Section 10 of Article I of the federal Constitution which prohibits the states from impairing obligations of contract. But Congress is not subject to any such restriction, and the plan before this Court is promulgated not by virtue of any state law, but under the paramount and exclusive power of the federal government to regulate interstate commerce and its instrumentalities.

In the Havender case, supra, the Supreme Court of Delaware made it clear that the public policy of that state did not prohibit the elimination of accrued unpaid and undeclared dividends. There the court found in Sections 59 and 59A of the General Corporation Law a caveat to preferred shareholders (apparently missing in Section 26) that their right to accumulated unpaid and undeclared dividends

might be eliminated. The court therefore held that those sections afford means to accomplish that end without conflicting with the prohibition of Section 10 of Article I of the federal Constitution.

The policy of Delaware law and the concern of the courts of that state with this subject was well phrased in the Havehder case, supra, where the court said, 11 A.2d at page 342: "There is no invasion of legal or equitable right, nor is there moral wrong, in disposing of dividends on preference stock accumulated through time other than by their payment in money, if the right to such dividends has not the status of a fixed contractual right * * *, and if the terms of disposal are fair and equitable in the circumstances of the case; * * *."

Thus the public policy of Delaware is not against the compounding of accumulated dividends. It is only when state action in that regard would invade contract rights that the law of Delaware hesitates. But, as already noted, the plan before this Court is not based on Delaware law, but on paramount federal law which is not subject to Section 10 of Article I of the federal Constitution.

■■■■ It has been further suggested that in their application to the case at bar Sections 11(b) (2) and 11(e) of the Act are "spoliative and confiscatory and in violation of the Fifth Amendment." But as the Supreme Court has on numerous occasions pointed out the proscription by the Fifth Amendment of the deprivation of property without due process of law applies only to direct appropriations. Norman v. Baltimore & Ohio R. Co., 1935, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Union Bridge Co. v. United States, 1907, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Scranton v. Wheeler, 1900, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126; Legal Tender Cases, 1870, 12 Wall. 457, 20 L.Ed. 287.

Thus in answer to a similar contention it was said in the Legal Tender Cases, supra, 12 Wall. at 551, 20 L.Ed. 287:

"* * * That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? * * *"

That no taking within the meaning of the Fifth Amendment is here involved is apparent.

■■■■ There is a further suggestion that Sections 11(b) (2) and 11(e) of the Act do not authorize a plan altering the rights of ∘stockholders inter sese. This is coupled with the additional suggestion that this Court cannot enforce such a plan because Section 11(e) of the Act gives the Court jurisdiction only over the Company and its assets but not over the stockholders.

Section 11(b) (2) expressly provides for the elimination of undue and unnecessary complications in the corporate structure of a company. But the corporate structure of a company consists of the classes of its securities outstanding and the respective rights of their holders. Certainly if undue and unnecessary complications in a company's corporate structure are to be eliminated the statute must envision a readjustment of those rights. Any other interpretation of the statute would render it ineffectual to accomplish one of its stated purposes.

■■■■ Section 11(e) of the Act gives the Court jurisdiction over the corporation and its assets to the extent necessary to enforce and carry out the plan. Such jurisdiction is manifestly sufficient to work a readjustment of the rights of security holders. This is so, at least in so far as stockholders are concerned, because jurisdiction over the corporation carries with it jurisdiction over the corporate charter which is the source and mainspring of shareholders' rights. Having jurisdiction over the corporation and its charter the court has ample power. On numerous occasions stockholders' rights have been altered by courts acting under former Section 77B of the National Bankruptcy Act and Chapter X of that Act as amended, 11 U.S.C.A. § 207, 501 et seq. In both such classes of cases the courts had jurisdiction not over the stockholders but merely over the corporation and its assets.

It would seem that stockholders of a corporation involved in proceedings under Section 11(e) of the Act are in no differ-

ent position from stockholders of corporations in reorganization under Section 77B or Chapter X. In each case the stockholders are afforded opportunity for hearing. They may take advantage of that opportunity or they may not. But in any event the Court's jurisdiction over the corporation, deemed adequate to effect a readjustment of stockholders' rights under Section 77B and Chapter X, is clearly sufficient to accomplish that purpose under Section 11(e).

Finally, as Mr. Justice Pitney said in Blair v. United States, 1919, 250 U.S. 273, 279, 39 S.Ct. 468, 470, 63 L.Ed. 979: "Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it."

The constitutionality of the Act, moreover, is buttressed by a presumption to be overcome only "when the unconstitutionality exists beyond a rational doubt." International Merchantile Marine Co. v. Stranahan, C.C., S.D.N.Y., 1907, 155 F. 428, 430.

Similarly in Sarony v. Burrow-Giles Lithographic Co., C.C., S.D.N.Y., 1883, 17 F. 591, 592, the late distinguished father of my colleague Judge Coxe said: "The court should hesitate long and be convinced beyond a reasonable doubt before pronouncing the invalidity of an act of congress. The argument should amount almost to a demonstration. If doubt exists the act should be sustained. The presumption is in favor of its validity. This has long been the rule—a rule applicable to all tribunals, and particularly to courts sitting at nisi prius. Were it otherwise, endless complications would result, and a law which, in one circuit, was declared unconstitutional and void, might, in another, be enforced as valid."

For the foregoing reasons the application will be granted. Submit findings of fact and conclusions of law and decree providing that this Court approves the Plan as fair and equitable to the persons affected and necessary to effectuate the provisions of subsection (2) of Section 11(b) and that this Court as a Court of Equity for the purpose of carrying out the terms and provisions of such Plan takes exclusive jurisdiction and possession of the Company and the assets thereof wherever located and appoints the Company as sole Trustee in possession to hold and administer under the direction of the Court and in accordance with the Plan thus approved, the assets so possessed.