## AMERICAN POWER AND LIGHT CO. v. SECURITIES AND EXCHANGE COMMISSION.

## ELECTRIC POWER & LIGHT CORPORATION v. SAME.

Nos. 3823, 3824.

Circuit Court of Appeals, First Circuit.
March 17, 1944.

Root, Clark, Buckner & Ballantine, of New York City (Arthur A. Ballantine, Wilkie Bushby, and Joseph Schreiber, all of New York City, of counsel), Simpson Thacher & Bartlett, of New York City (John F. MacLane and Douglas A. Calkins, both of New York City, of counsel), and Reid & Priest, of New York City (Frank A. Reid, of New York City, of counsel), for petitioner American Power & Light Co.

Wright, Gordon, Zachry, Parlin & Cahill, of New York City (Wallace P. Zachry and Daniel James, both of New York City, of counsel), Simpson Thacher & Bartlett, of New York City (John F. MacLane, Douglas A. Calkins and Gunnar Fromen, all of New York City, of counsel), and Reid & Priest, of New York City (Frank A. Reid, of New York City, of counsel), for petitioner Electric Power & Light Corporation.

John F. Davis, Sol., Milton V. Freeman, Asst. Sol., David K. Kadane, Special Counsel, Public Utilities Division, and Louis Loss, Atty., all of Philadelphia (Alfred Berman, of Washington, D. C., of counsel), for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

These cases come here on petitions of American Power & Light Company (hereinafter referred to as American) and Electric Power & Light Corporation (hereinafter referred to as Electric), both companies being Maine subholding company subsidiaries of Electric Bond & Share Company (hereinafter referred to as Bond & Share), for review of orders of the Securities and Exchange Commission dated August 22, 1942, requiring the dissolution of the two petitioners. The petitions for review were filed under § 24(a) of the Public Utility Holding Company Act of 1935, 49 Stat. 834, 15 U.S.C.A. § 79x(a).

The orders were issued pursuant to § 11(b) (2) of the Act, 15 U.S.C.A. § 79k(b) (2), on the basis of a finding by the Com-

mission "(1) that the corporate structures and continued existence of American and Electric unduly and unnecessarily complicate the structure of the Bond and Share system and unfairly and inequitably distribute voting power among the security holders of such system; (2) that to effectuate the statutory requirements it is necessary that American and Electric be dissolved." In the case of American the order under review provided, inter alia:

"It is further ordered pursuant to Section 11(b) (2) of the Public Utility Holding Company Act of 1935 that the existence of American Power & Light Company shall be terminated and that said company shall be dissolved;

"It is further ordered that respondent American Power & Light Company and respondent Electric Bond and Share Company shall proceed with due diligence to submit to this Commission a plan or plans for the effectuation of this order, and shall take such other and further steps as may be necessary or appropriate to effectuate this order; * * *"

An order in corresponding terms was directed against Electric.

Relevant portions of § 11 of the Act are copied in the footnote.[1]

---

[1] "Sec. 11. (a) It shall be the duty of the Commission to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system.

"(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system: Provided, however, That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation. The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems.

"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system. In carrying out the provisions of this paragraph the Commission shall require each registered holding company (and any company in the same holding-company system with such holding company) to take such action as the Commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is

Section 11(b) (2) makes it the duty of the Commission, as soon as practicable after January 1, 1938:

"To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the struc-

a holding company. Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company. The Commission may by order revoke or modify any order previously made under this subsection, if, after notice and opportunity for hearing, it finds that the conditions upon which the order was predicated do not exist. Any order made under this subsection shall be subject to judicial review as provided in section 24.

"(c) Any order under subsection (b) shall be complied with within one year from the date of such order; but the Commission shall, upon a showing (made before or after the entry of such order) that the applicant has been or will be unable in the exercise of due diligence to comply with such order within such time extend such time for an additional period not exceeding one year if it finds such extension necessary or appropriate in the public interest or for the protection of investors or consumers.

"(d) The Commission may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce compliance with any order issued under subsection (b). In any such proceeding, the court as a court of equity may, to such extent as it deems necessary for purposes of enforcement of such order, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction, in any such proceeding, to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer under the direction of the court the assets so possessed. In any proceeding for the enforcement of an order of the Commission issued under subsection (b), the trustee with the approval of the court shall have power to dispose of any or all of such assets and, subject to such terms and conditions as the court may prescribe, may make such disposition in accordance with a fair and equitable reorganization plan which shall have been approved by the Commission after opportunity for hearing. Such reorganization plan may be proposed in the first instance by the Commission, or, subject to such rules and regulations as the Commission may deem necessary or appropriate in the public interest or for the protection of investors, by any person having a bona fide interest (as defined by the rules and regulations of the Commission) in the reorganization.

"(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed."

ture, or unfairly or inequitably distribute voting power among security holders, of such holding-company system."

Acting under that authority the Commission instituted the present proceeding on May 9, 1940, by the entry of notice and order for hearing, naming as respondents Electric Bond & Share, several subholding company subsidiaries of Electric Bond & Share (including the two petitioners), and Ebasco Services, Inc. The order specified that the hearing was to determine whether it was necessary to discontinue the existence of or modify the corporate structure of, or redistribute the voting power among security holders of, Bond & Share or any of the other respondents and "what further action, if any, is necessary and shall be required to be taken by the respondents herein, or any of them, to ensure that the corporate structure or continued existence of any of the respondents herein does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of the holding company system of Electric Bond and Share Company." On June 7, 1940, the Commission entered an order that the hearing "shall be limited initially to the issue of whether it is necessary to discontinue the existence of American Power & Light Company [or] Electric Power & Light Corporation * * * in order to insure that the structure of the holding company system of Electric Bond and Share Company shall not be unduly or unnecessarily complicated and that voting power shall not be unfairly or inequitably distributed among security holders of such system." [2]

The hearing opened on June 18, 1940, before an examiner, and extended over a period of two years. A voluminous record was made, comprising over 18,000 pages of testimony and more than 1,500 exhibits.

Copies of the Commission's proposed findings, opinion and order were exhibited to counsel for American and Electric, who thereupon entered into stipulations, reading, in part, as follows:

"And a copy of Commission's proposed findings, opinion and order having been exhibited to counsel for American [Electric];

"And it appearing therefrom that the objections made by respondent American [Electric] in motions and exceptions, or otherwise in the record, have been fully presented to and urged before the Commission, and are ruled upon in said findings, opinion and order;

"It is hereby stipulated that respondent American [Electric] through its counsel hereby waives the filing of request for findings, further exceptions to the findings and opinion of the Commission, the filing of briefs and oral argument, but reserves all legal and constitutional rights, including its right to full judicial review of the said findings, opinion and order.

"Subject to the foregoing reservations of rights, it is stipulated that the Commission may proceed to enter its findings, opinion and order without further formality."

Thereupon, the Commission, on August 22, 1942, formally issued its findings, opinion and orders. Petitions for rehearing were filed on August 27 and denied the next day.

Petitioners seek to raise before us a great many issues, which fall into four basic categories: (1) those raising procedural objections to the orders; (2) those challenging the sufficiency of the evidence to sustain the Commission's ultimate findings; (3) those asserting that the orders are arbitrary and capricious, and (4) those challenging the constitutionality of § 11 (b) (2) of the Act. Some of these issues are not properly before us; others have been passed upon by decisions in other circuits and do not need extended discussion.

■■ Section 24(a) of the Act provides that: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do." Observing this limitation upon our power of review, we must decline to consider the following objection, which the petitioners have presented here but did not urge before the Commission: that §

---

2 This order did not, as petitioners contend, amount to a predetermination by the Commission that elimination of the subholding companies would necessarily have to be the remedy to be applied if it should be found that undue complexity and inequitable distribution of voting power existed in the holding company system. Under the issue as framed it was open to petitioners to make a showing that some other remedy was more appropriate, and that dissolution of American and Electric was not necessary to ensure compliance with § 11(b) (2).

11(b) (2) does not as a matter of statutory interpretation authorize the dissolution of subholding companies as one method of bringing a holding company system into compliance with that subsection. Marshall Field & Co. v. National Labor Relations Board, 1943, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744; Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, 386; Todd v. Securities and Exchange Commission, 6 Cir., 1943, 137 F.2d 475. The last two cases just cited held that § 24(a) would preclude judicial review even of questions as to the constitutionality of the Act, if such issues were not raised before the Commission. There may be some doubt whether this is so; since an administrative agency necessarily assumes the constitutionality of the statute under which it operates, it might perhaps be held that this constitutes "reasonable grounds" for the failure to raise constitutional issues before the Commission. However that may be, there can be no doubt that under § 24(a) petitioners were obliged to raise before the Commission issues as to the Commission's statutory authority to issue the contemplated orders. We do not find that the Commission in the course of the proceedings did anything which might be held to constitute a "waiver" of this requirement. The stipulation filed by petitioners just before the formal entry of the orders reserved in general terms all legal and constitutional rights, including the "right to full judicial review of the said findings, opinion and order". This can only mean judicial review according to law. It cannot confer upon us power to review questions which § 24(a) forbids us to review because they were not raised before the Commission.

■ For the same reason, the following objections, which were not made before the Commission, cannot be considered by us: (1) that petitioners are legally incapable of complying with the order of dissolution because dissolution can be effectuated only by a vote of the stockholders in pursuance of procedure prescribed by state law; (2) that the orders are not in accordance with § 11(b) (2) in that they fail to prescribe the "steps" which petitioners must take to effectuate compliance with the statutory requirements; (3) that the orders operate in effect to deprive petitioners of the benefit of the one-year period granted by § 11(c) within which to comply with the orders.

■ Petitioners refer to the direction in § 11(b) (2) that the Commission shall proceed thereunder "as soon as practicable after January 1, 1938", and object that the orders should not have been made since it is not "practicable" at this time "to require the acts provided for therein, in view of the effect of the present emergency created by the war, including the depressed condition of financial markets and the present uncertainties and difficulties of our national economy." This objection is sufficiently answered in Todd v. Securities and Exchange Commission, 6 Cir., 1943, 137 F.2d 475, 479:

"Petitioner urges that the issuance of the order at the present time is 'impracticable,' due to war conditions and their effect upon the business of the System. But the statute, while providing due protection for investors, has not made convenience for the holding company the test of statutory practicability. The term 'as soon as practicable' clearly means that the action contemplated by the statute shall be taken 'as soon as practicable' for the Commission."

Section 11(a) contemplates that the Commission shall make studies of each registered holding company and subsidiary to determine the extent to which the corporate structure of such holding company system may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public utility system. It is then the Commission's duty "as soon as practicable" to proceed under § 11(b). It is fully apparent from the record that the Commission made a preliminary examination of the Bond & Share system. The Commission's notice and order for hearing in the present proceedings stated at the outset:

"The Commission having examined the corporate structure of Electric Bond and Share Company, a registered holding company, and its subsidiary companies, the relationships among the companies in the holding company system of said Electric Bond and Share Company, the character of the interests thereof and the properties owned or controlled thereby, and the Com-

mission having reasonable grounds to believe that * * *." (Then follows a detailed description of the history, structure and property of the system and an assertion of the Commission's belief that the system is not in compliance with the requirements of § 11(b) (2).)

It is argued that the Commission was required to institute and complete proceedings under § 11(b) (1) looking toward the integration of the operating subsidiaries before it was authorized to enter an order in § 11(b) (2) proceedings. This argument was rejected, and, we think, correctly, in Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 754, where the court said:

"The final assignment of unfairness is based upon the fact that the Commission failed to consider the effect of any orders which may hereafter be made by it in the proceedings under section 11(b) (1). There is, however, no direction in the act as to whether proceedings under section 11(b) (1) or under section 11(b) (2) should be first determined. The order of procedure is left entirely to the discretion of the Commission. We may not interfere with the exercise of its discretion in this case."

A similar objection is based upon the refusal of the Commission to grant motions by the petitioners, made in December, 1941, to consolidate the hearings on plans submitted by the petitioners under § 11(e) with the present § 11(b) (2) proceedings. On July 23, 1941, American had filed with the Commission an application for approval by the Commission of a detailed plan of reorganization purporting to bring the company into compliance with the requirements both of §§ 11(b) (1) and 11(b) (2) of the Act. Electric had filed a similar application on December 3, 1941. In explaining its reasons for denying the motions to consolidate, the Commission stated that hearings on the § 11(e) plans would unduly prolong the § 11(b) (2) proceedings and it pointed out certain defects appearing on the face of the plans which, in the judgment of the Commission, would render them wholly inadequate to accomplish their purported purpose of meeting the statutory requirements. Further, the Commission stated:

"We regard as wholly untenable respondents' contention that in carrying out our duties under Section 11 we cannot find 'necessary' a course of action for which some alternative may be present, since such a construction would lead to the result that we should be rendered impotent to order *any* action where several courses of action appeared available to achieve the statutory objectives. On the basis both of plain logic and the basic principles of statutory construction, we deem it indisputable that the steps or action we must find 'necessary' within the meaning of Section 11 are such as seem to us designed to *ensure* effectuation of the provisions of the Section *most effectively and promptly."*

We find nothing in § 11 which would require the Commission, before issuing any order under § 11(b) (2), to hold a hearing on applications tardily filed by the companies under § 11(e). Under the circumstances we hold that the Commission did not abuse its discretion in denying the motions to consolidate. And see Commonwealth & Southern Corp. v. Securities and Exchange Commission, supra, 134 F.2d at page 754.

The Commission pointed out that its orders under § 11(b) (2) did not exclude the possibility that American and Electric might actually proceed to reconstitute themselves and their systems in such manner that dissolution would no longer be necessary to "ensure" compliance with statutory requirements. In that event the Commission is empowered by § 11(b) to "revoke or modify any order previously made under this subsection, if, after notice and opportunity for hearing, it finds that the conditions upon which the order was predicated do not exist."

We proceed to review, at not too great length, the ultimate statutory findings by the Commission upon which its orders were predicated.

The Commission sets forth with a wealth of detail the history of the organization, development, capitalization and structure of the Bond & Share system, and the role of the present petitioners therein. The subsidiary facts are not really in dispute, though petitioners challenge certain of the Commission's inferences and conclusions therefrom.

The Bond & Share system is a pyramid-like structure of which Bond & Share itself constitutes the apex, a number of sub-holding companies (including American and Electric) form an intermediate tier, and over two hundred direct and indirect

subsidiaries of the latter form the base. In respect of capitalization and assets, number of customers and geographical area served, and quantity of electricity generated and gas sold, the Bond & Share system constitutes the largest single public utility holding company system registered under the Act.

Bond & Share owns securities in American representing 20.7% of the total voting power. It owns securities in Electric representing 46.8% of the total voting power. Quite apart from the statutory presumption in § 2(a) (7) and (a) (8), 15 U.S.C.A. § 79q(a) (7, 8), it is clear and undisputed that Bond & Share controls American and Electric, and that such control pervades the whole of these subholding company systems in a most comprehensive manner.

The general pattern followed by Bond & Share in developing its system through the instrumentality of subholding companies is described by the Commission, with much supporting detail, as follows:

" * * * assets were placed on the books of the subholding companies at sums considerably in excess of their cost to Bond and Share and its associates in the particular venture (the 'syndicate'); the subholding company would then issue to Bond and Share and associates senior securities (either notes or preferred stock) in a face amount more than sufficient to cover the cost of the assets turned over to the subholding company, and would also issue substantial amounts of common stock (having a majority of total voting power) against the company's inflated investment account. Bond and Share and associates would sell to the public the senior securities plus a bonus of common stock, for the approximate face amount of the senior security, thereby recouping all cash outlays; the promoters would then be left with substantial blocks of common stock at no cash cost (sometimes indeed with a cash profit) which they would divide among themselves, the lion's share always going to Bond and Share as 'manager' and promoter of the venture. Thus, Bond and Share would emerge with a substantial block of voting stock at no cost, and complete control of the new corporation (and its subsidiaries) assured through the concentrated voting strength of its common stock holdings and the execution of Bond and Share's standard 'service contract' whereby Bond and Share employees 'officered' the company, formed more than a majority of its board, and 'took over the management of the company and its subsidiaries'.

"As a corollary to this method of financing the subholding companies, there also invariably resulted a serious inflation in the accounts of the operating company subsidiaries which were set up. Since the assets received at organization by the subholding companies were generally entered in their book accounts at inflated figures, they were transferred by the subholding companies to the operating companies at sums embodying at least an equivalent amount of inflation and sometimes a greatly increased amount. In this way there was passed over to the consumer the burden of supporting the watered capitalization of both operating company and the subholding company, while the public investors in the securities of the operating company and the subholding company who may have purchased their securities in reliance on balance sheets containing serious inflation were not informed thereof."

American was organized by Bond & Share in 1909. After reciting the organization steps and methods of financing, the Commission concluded:

"It is thus apparent that Bond and Share had succeeded in realizing for itself complete working control of the new company and better than a 20% equity in it, after recovering every dollar of its investment in the securities transferred to American, plus a cash profit of approximately $120,000. Otherwise stated, Bond and Share had sold out an 80% interest in the aforementioned securities recovering thereby its entire cost plus a substantial profit without in any way parting with control of such securities or of the properties which they represented. These facts obviously afford some illumination as to the meaning of Bond and Share's executive committee when it authorized the formation of American 'to minimize the risks and commitments' of Bond and Share.

"The obverse side of the coin must not be overlooked. American had issued $8,000,000 par value of its own securities to acquire $500,000 cash and securities which had recently cost Bond and Share less than $1,700,000. The cash paid over to Bond and Share for the securities and the profits realized by Bond and Share were furnished by the public which purchased American's securities. Nevertheless, con-

trol of the company rested firmly in Bond and Share's possession."

In the years following, American enormously expanded its capitalization and holdings. As its succeeding issues of preferred stock to the public diluted somewhat the voting control of Bond & Share, such control was reinforced from time to time by various means, including common stock splitups,[3] and the issuance of additional common stock as dividends on American's outstanding common stock.

Electric was organized by Bond & Share in 1925. The Commission found:

"The outcome for Bond and Share of the organization and financing of Electric was successful beyond all previous similar ventures. For its holdings of Utah Securities Corporation common stock (59,193 shares) representing a cost to Bond and Share of $618,123, it had received $561,930 in cash and 224,772 shares of Electric common. For its basket of other securities transferred to Electric having a cash cost of $19,390,385 it received the equivalent of $25,889,076 in cash plus 50,000 shares of common stock and 353,408 option warrants to buy additional common at $25 per share. Through the various transactions in connection with Electric's organization, Bond and Share acquired an additional 23,569 shares of common at a cost of $36,216 or $1.53 per share. In total, Bond and Share emerged with 298,341 shares of common and 353,408 option warrants at no cost, 9,480 shares of second preferred stock at a cost of $854,904, and a net cash profit of approximately $6,500,000 on the securities surrendered to Electric, most of which had been held less than two years.

"Not only did Bond and Share acquire its entire initial common stock investment in Electric at a cost of approximately minus $6,500,000, but in customary fashion it also emerged with complete control of the new company."

Though the capitalization of Electric in the succeeding years was, as in the case of American, greatly increased, Bond & Share maintained its control throughout.

Arrearages of cumulative dividends on the preferred stocks of American and Electric have mounted steadily, year by year, since 1932. As of December 31, 1941, such arrearages on the two classes of preferred stock in American amounted to $35,114,788, representing more than three and a half years' requirements on each class. As of the same date, the arrearages on Electric's preferred stock amounted to $50,889,325, representing more than nine years' requirements on its first preferred stock and over ten years' requirements on its second preferred. Notwithstanding this, the Commission pointed out that Bond & Share has continued in full control of petitioners by virtue of the absence from petitioners' charters and bylaws of any provision for increased voting power or other protective features for the preferred stocks when dividends are in arrears.[4]

Up until 1935 American organizationally was "scarcely more than a set of books in Bond & Share's office." The same was true of Electric. All officers of petitioners were employees of Bond & Share and paid exclusively by it; neither petitioner had any employees of its own. All corporate activities performed for or in the name of petitioners were performed by employees of Bond & Share.

In November, 1935, shortly before the registration provisions of the Public Utility Holding Company Act went into effect, certain organizational changes were made, designed to give petitioners the semblance of being independent entities. In the case of American, 17 employees of Bond & Share became, formally, officers and employees of American, and were removed, together with American's books and records, into a separate suite of rooms in the Bond & Share office building. Similarly, a group of 14 employees of Bond & Share became, formally, officers and employees of Electric and were moved, together with Electric's books and records, into a separate suite of offices adjoining those of American. The formal interlocking which had theretofore existed between the boards of directors of Bond & Share and petitioners and their subsidiaries was substantially terminated. At the same

[3] The Commission cites similar instances of common stock split ups in operating companies to reinforce the voting control of the subholding companies over their subsidiaries.

[4] The Commission further pointed out that the charters contained express waivers of stockholders' preemptive rights and gave the directors power to authorize the issuance of additional stock and perpetual option warrants to such persons and at such prices as they deemed fit.

617

time Bond & Share organized Ebasco Services, Inc., a wholly-owned subsidiary, to which was transferred the entire service section of Bond & Share. The subsidiaries of petitioners duly entered into service contracts with Ebasco and have continued to operate under such arrangements up to the present time.

■ We think the Commission was justified in finding, as it did, that these changes were superficial, and in no way cured the vulnerability of petitioners under § 11(b) (2) of the Act. The personnel transferred to American and Electric were sufficient merely to perform the routine activities incident to the functioning of the subholding companies as corporate owners of securities. Petitioners were not endowed with the function of servicing their operating subsidiaries. The Commission added, "The record further establishes that there is close and constant contact and coordination between the personnel of the subholding company respondents and the personnel of Bond and Share and Ebasco and that, in effect, the personnel of the subholding companies have functioned since November 21, 1935 as subsidiary and complementary organizations of Bond and Share, possessed of substantially the same outlook, objectives, and loyalties as they had prior to November, 1935."

■ In its findings on the issue of undue complexity, the Commission was guided by the detailed statements of policy expressed by Congress in § 1 of the Act, 49 Stat. 803, 804, 15 U.S.C.A. § 79a.

Petitioners have not in the past served any functional purpose in the management of their operating subsidiaries. The subsidiaries of American and Electric were grouped together for purposes of management on geographical lines "irrespective of holding company affiliation". The actual management prior to 1935 was performed by Bond & Share's own service section, and after 1935 by Ebasco, Bond & Share's wholly-owned subsidiary.

To petitioners' claim that they have served a useful purpose in assembling "scattered properties into compact and integrated companies" the Commission responded that the acquisition and combination of operating properties have really been done by Bond & Share, and that ownership has nominally been placed in the subholding companies "for the purpose of getting public investors to provide the

money to: (1) reimburse Bond and Share, with a profit, for its entire investment in groups of assets, while leaving Bond and Share in undisturbed dominion of these assets and with claims to a portion of their earnings; and (2) acquire control of the greatest possible number of additional properties to which Bond and Share's dominion would extend."

Mr. S. R. Inch, then president of Bond & Share, testifying before the House Committee on Interstate and Foreign Commerce, while the Act was in process of passage, stated that the subholding companies "serve no functions except the very important ones of providing the equity money for, and the cash needed from time to time by their own operating subsidiaries."

The Commission, however, pointed out that "no substantial amount of risk capital was furnished to the operating companies by either the subholding companies or by Bond and Share"; that the investments which the subholding companies made in the securities of the operating companies "were made principally in the process of *purchasing control* of the operating companies from those in whom this control rested, a process which contributed nothing to the treasuries of the operating companies"; that it has been "the public investors in the securities of the subsidiaries of American and Electric who have supplied virtually all the capital that has gone into the development of such subsidiaries subsequent to their acquisition by American and Electric, just as it has been the public investors rather than Bond and Share who supplied to American and Electric the capital which enabled them to acquire such control." With respect to the claim that the subholding companies have conferred benefit upon their subsidiaries by supplying them with short-term capital in the form of loans, the Commission stated that "these loans do not impress us as having conferred any noteworthy benefit on the operating companies." Further, it found that since 1935 "American and Electric have made loans to subsidiaries in perhaps a dozen instances, the amounts involved being relatively small and in most cases for very short periods. Since the subholding companies charged from 3 to 6% on loans which almost certainly could have been obtained by the subsidiaries from banks for less, it is clear that the transactions were designed to benefit the sub-

holding companies rather than the subsidiaries and were actually at the expense of the subsidiaries." Furthermore, it is not apparent why such loans could not just as readily have been made by Bond & Share itself.

In commenting on the impression of simplicity and symmetry derived from a glance at the corporate chart of the Bond & Share system, the Commission pointed out that "each of the major corporate units at the base of the system itself has a complex capital structure in which the principles of pyramiding and leverage are employed in very full measure. Upon each such corporate structure there is superimposed a holding company with a complex structure of its own, and in turn, upon this holding company there is superimposed still another holding company having its own unduly complex structure, a high degree of pyramiding being employed in the process of superimposition." Although ostensibly the system is comprised of only three levels, nevertheless, the Commission stated, "income derived from the basic functions of the system, namely the generation and sale of electric energy and gas, cannot reach the common stockholders of the top holding company until it has been filtered through *seven to fourteen* classes of securities having prior claims to such earnings." The complicating effect of this structure is described by the Commission as follows:

"This multiplicity of steps obviously in itself creates a formidable problem for an investor in the securities of Bond and Share or the subholding companies seeking to appraise the earning power of his securities. The problem is, of course, greatly intensified by the fact that the system income does not progress in a straightforward continuous line from step to step until the top level is reached, but is drawn off and co-mingled at the level of the subholding companies with income from all the subsidiaries of each of the subholding companies, and there diverted to meeting the requirements of the security structures of the subholding companies. In the case of three of the five subholding companies (American, Electric and American & Foreign Power Company, Inc.), the corporate structures are so ill-balanced that for the last 10 years dividends on preferred stock have accumulated each year, and these accumulated arrearages now constitute mountainous barriers athwart the flow of system income to the top level.

"Furthermore, the problem of income appraisal is acutely complicated when viewed from its dynamic rather than its static aspects, in appraising the effects of changes and shifts of income. Where the investor is required, as is here the case, to evaluate the future earnings prospects of securities resting near the top of a pyramided structure, he is confronted with the almost impossible task of measuring the magnified impact of income changes at the lower levels of the structure upon those higher in the pyramid resulting from the sharp leverage factor of hyper-attenuated equities.

"All the foregoing factors, of course, come into play as well in the appraisal of the asset value of the securities of Bond and Share and the subholding companies and serve to complicate the problems of appraisal beyond the limits of even the sophisticated investor."

We cannot say that the Commission was unwarranted in concluding that the corporate structure and continued existence of American and Electric unduly and unnecessarily complicate the holding company system of Bond and Share.

Nor can we say that the Commission was unwarranted in finding that the capital structure and continued existence of petitioners unfairly and inequitably distribute voting power among security holders of the Bond & Share system. The Commission, in reaching this conclusion, recited the facts in great detail, relying primarily (1) upon a historical survey of the steps and methods by which the Bond & Share system was put together and developed, with attention to the actual cost to Bond & Share and petitioners of investments whereby control of vast properties was secured, and (2) upon a consideration of the investments of Bond & Share and petitioners compared with the total capitalization of petitioners' subsidiaries, as appears on the companies' own books.

As of December 31, 1941, the total capitalization (including long-term debt and surplus) of American's subsidiaries amounted to $729,143,155. Bond & Share controls this immense pool of capital through ownership of common and preferred stock of American representing, on the books, an interest of only 3.42% in

the total capitalization of American's subsidiaries. As of December 31, 1941, the total capitalization (including long-term debt and surplus) of Electric's subsidiaries was $653,981,088. Bond & Share controls this immense pool of capital through ownership of common and preferred stock of Electric representing, on the books, an interest of only 8.72% in the total capitalization of Electric's subsidiaries. The Commission indicated that the disproportion would be much greater if adjustment were made for write-ups and insufficient depreciation reserves.

Petitioners contend that for purposes of this comparison the bonded indebtedness should be excluded from the capitalization totals, but the Commission was not obliged to disregard this element in determining whether holding company control "is exerted through disproportionately small investment", § 1(b) (3), a situation which Congress has found to be frequently productive of various evils.

At the hearing before the examiner American offered certain valuation testimony purporting to show the present valuation of assets and securities. The examiner excluded such evidence as irrelevant to the pending issues. In its final findings and opinion the Commission sustained this ruling of the examiner on the ground that valuation testimony is inadmissible in an 11(b) (2) proceeding of this kind. Petitioners claim that this ruling by the Commission was error on the ground that the Commission's ultimate findings and orders were based in part upon findings by the Commission as to present valuation. We think we should indulge the presumption that the Commission and its lawyers would know enough not to commit the egregious blunder of (1) making a ruling that petitioners could not be allowed to introduce valuation evidence, and (2) in the same document making ultimate findings predicated in part upon subsidiary findings as to valuation. This consideration would weigh with us in resolving any possible ambiguities that might exist in the Commission's findings. However, from a careful reading of the findings we do not believe that they rest upon subsidiary findings as to present valuations, or that valuation evidence, if introduced, would have made any difference in the Commission's findings and conclusions on the pending issues. A similar exclusion by the Commission of valuation evidence was sustained in Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 754. Such valuation evidence may become relevant at a later stage, in proceedings under § 11(d) or § 11(e).

■ Accepting, as we have done, the Commission's ultimate statutory finding "that the corporate structures and continued existence of American and Electric unduly and unnecessarily complicate the structure of the Bond and Share system and unfairly and inequitably distribute voting power among the security holders of such system", we next have to consider the appropriateness of the remedy selected by the Commission. The companies must take such steps as the *Commission* shall find necessary to *ensure* that the requirements of § 11(b) (2) are met as soon as practicable. It is not enough that some other remedy, suggested by petitioners, might accomplish the statutory purposes in whole or in part. The choice of remedy is a matter confided primarily to the expert judgment of the Commission, and in this field the courts are quite properly loath to set up their own judgment in opposition to that of the administrative tribunal. Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. In Herzfeld v. Federal Trade Commission, 2 Cir., 140 F.2d 207, 209, Learned Hand, C.J., pointed out that "the Supreme Court has as much circumscribed our powers to review the decisions of administrative tribunals in point of remedy, as they have always been circumscribed in the review of facts. Such tribunals possess competence in their special fields which forbid us to disturb that measure of relief which they think necessary. In striking that balance between the conflicting interests involved which the remedy measures, they are for all practical purposes supreme."

■ Here the Commission has found "that to effectuate the statutory requirements it is necessary that American and Electric be dissolved." [5] There can be no

---

[5] Counsel for the Commission call our attention to the fact, for what it is worth, that in their answer filed in Electric Bond & Share Co. v. Securities and Exchange Commission, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R.

doubt that the remedy of dissolution will *ensure* that the corporate structures and continued existence of petitioners will no longer unduly complicate the structure of the Bond & Share system nor unfairly distribute voting power among the security holders of such system. We are unable to say that this choice of remedy is so lacking in rational basis as to amount to an arbitrary and capricious act outside the broad scope of discretion confided to the Commission.

The present litigation is but part of a larger proceeding instituted by the Commission to deal in accordance with the statutory mandates with the whole Electric Bond & Share system and all of its component parts. We are not in a position now to size up the whole broad situation, nor do we know what the Commission may have in mind to do with the many Bond & Share problems which will remain after the present cases, dealing with two of Bond & Share's subholding companies, are disposed of.

· Petitioners argue, somewhat plausibly, that if their corporate structures and continued existence have the found effects upon the Bond & Share system, the statutory requirements could have been met by simply removing them from such system without ordering their dissolution; and that this could be accomplished by an order directing Bond & Share, the top holding company, to divest itself of its control over the intermediate holding companies. But, as we have said, the Bond & Share system, with which the Commission is dealing in its entirety in the proceeding pending before it, embraces all of its component parts, including petitioners and their subsidiaries. The severance of the top holding company would minimize somewhat the complexities, but would leave untouched certain complexities, and perhaps some features of inequitable distribution of voting power, in the American and Electric components.

 The Commission is not obliged, if there is a possible choice of remedy, to select the less drastic remedy which leaves the subholding companies in existence; in-

deed, § 1(c) of the Act declares the policy to be "to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title." The fact that petitioners have themselves the technical status of registered holding companies does not guarantee their survival. Running through petitioners' briefs is the thought that the guilt, if any, is that of Bond & Share, and that it is unreasonable to destroy the innocent victims for the sins of the real culprit. But American and Electric have no independent standing as innocent victims. Since the time of their creation, as found by the Commission, they have been merely the creatures and instrumentalities of Bond & Share, utilized as pyramiding and leverage devices for the accomplishment of purposes inimical to the policy of the Act.[6]

The Commission considered the suggestion that petitioners might be left in existence to perform the function of holding together integrated public utility systems as contemplated by § 11(b)(1); and observed: "There is nothing about the subholding companies which makes them vehicles for holding together a single integrated system in any respect superior to any other corporate entity, and in fact it would seem that a company specially formed for this purpose, with appropriate domicile and a charter and by laws free from the complexities found in those of American and Electric, would be far preferable." As we understand the orders under review, it is open to each of the petitioners, in submitting plans for effectuation of the orders, to propose a reorganization along these lines looking toward the creation of a new holding company.

 Petitioners raise a number of constitutional points, which are now in order to be considered.

It is contended that § 11 is beyond the power of Congress under the commerce clause. Art. 1, § 8, cl. 3. However, § 11 (b)(1) was held valid against such attack in North American Co. v. Securities and Exchange Commission, 2 Cir., 1943, 133 F.2d 148, 153, 154, certiorari granted, 1943,

---

105, the present petitioners alleged that enforcement of § 11 would "leave them with no alternative but to dissolve, go out of business, and sacrifice their investments ₀ for anything that they may bring".

6 Though the orders under review were directed to Bond & Share, as well as to American and Electric, Bond & Share filed no petition for review, being apparently confident that its interests would be fully represented by the present petitioners.

318 U.S. 750, 63 S.Ct. 764, 87 L.Ed. 1126. And § 11(b) (2) was upheld against such attack in Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 752, 753, followed in Central & South West Utilities Co. v. Securities and Exchange Commission, App.D.C.1943, 136 F.2d 273. To the same effect see In re Community Power & Light Co., D.C.S.D. N.Y. 1940, 33 F. Supp. 901. Petitioners have not sustained the rather heavy burden, which is theirs, of persuading us to create a conflict with these cases by holding otherwise. Resolving in favor of constitutionality any doubts that might exist, we think it sufficiently appears from the Act as a whole that § 11 is tied in with the commerce power.

True enough, § 11(b) (2) contains no reference to interstate commerce. It applies to "each registered holding company, and each subsidiary company thereof." Petitioners argue that the Act is defective in that it contains no provision that the Commission must find "that the particular companies to which it applies Section 11 (b) (2) are actually engaged in, or do affect, interstate commerce, and that the changes in distribution of voting power and corporate structure directed by the S.E.C. affect interstate commerce".

██ Bond & Share and petitioners were obliged to register under § 5, 15 U. S.C.A. § 79e, because otherwise, as provided in § 4(a), 15 U.S.C.A. § 79d(a), they could not have continued to use the instrumentalities of interstate commerce directly or through their subsidiaries in the operation of their business. Electric Bond & Share Co. v. Securities and Exchange Commission, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105. As Judge Swan said in North American Co. v. Securities and Exchange Commission, supra, 133 F.2d at page 153: "Section 3 provides administrative procedure by which a holding company can obtain exemption from any provision of the Act, if it and its subsidiaries are predominantly intrastate in character." The provision of the Act referred to is as follows:

"Sec. 3. (a) The Commission, by rules and regulations upon its own motion, or by order upon application, shall exempt any holding company, and every subsidiary company thereof as such, from any provision or provisions of this title, unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers, if—

"(1) such holding company, and every subsidiary company thereof which is a public-utility company from which such holding company derives, directly or indirectly, any material part of its income, are predominantly intrastate in character and carry on their business substantially in a single State in which such holding company and every such subsidiary company thereof are organized; * * *." 15 U.S.C.A. § 79c(a) (1).

In interpreting and applying its power of exemption under this section, the Commission has been guided by the provision in § 1(c), reading: " * * * it is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce." Thus it has ruled that an exemption otherwise allowable should not be denied under the "unless and except" clause of § 3(a), unless the exemption would be detrimental to the interests of the public or of investors or consumers "by reason of any activities of the applicant or of any such subsidiary company in interstate commerce, or directly affecting or burdening interstate commerce." Long Island Lighting Co., 1936, 1 S.E.C. 345, 346. This interpretation by the Commission is entitled to great weight and should be accepted by the courts. United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Securities and Exchange Commission v. Associated Gas & Electric Co., 2 Cir., 1938, 99 F.2d 795, 798.

██ Furthermore, whatever might be the objection to applying § 11(b) to a holding company whose activities are less clearly related to interstate commerce, there is no doubt that the present petitioners, and their parent company, "are engaged in activities which bring them within the ambit of congressional authority." Electric Bond & Share Co. v. Securities and Exchange Commission, 1938, 303 U.S. 419, 431, 58 S.Ct. 678, 681, 82 L.Ed. 936, 115 A.L.R. 105. Petitioners "are engaged in transactions of interstate com-

merce. That they conduct such transactions through the instrumentality of subsidiaries cannot avail to remove them from the reach of the federal power." 303 U.S. at page 440, 58 S.Ct. at page 686. Petitioners occupy a "highly important relation to interstate commerce and the national economy." 303 U.S. at page 441, 58 S.Ct. at page 686. Under § 32, 15 U.S.C.A. § 79z—6, if the application of § 11 to any person or circumstances should be held invalid, the application of such section "to persons or circumstances other than those as to which it is held invalid shall not be affected thereby."

 It was not necessary for the Commission to find that the existing complexities of structure and inequitable distribution of voting power were adversely affecting interstate commerce in this particular case. Congress has found in § 1 that these evils often materially affect the interstate commerce in which the holding companies engage. There was ample basis for such finding in the reports of the Federal Trade Commission and of the committees of Congress which formed the basis of the legislation. Cf. Ecker v. Western Pacific Railroad Corp., 1943, 318 U.S. 448, 474, 63 S.Ct. 692, 87 L.Ed. 892. The following statement in the opinion by Judge Maris in Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 753, is pertinent at this point:

"Congress having thus incorporated its conclusion in the act itself it is not for this court to make an independent study of the economic data upon which the legislative conclusion was based. In view of its factual conclusion Congress was acting well within its constitutional power to strike at the evil by any means which seemed to it to be appropriate and desirable. It follows, likewise, that it is not open for us to consider whether the complications of corporate structure which the Commission found to exist in Commonwealth's case do actually adversely affect interstate commerce. Since Congress has found that such complications have adversely affected interstate commerce in many cases it is clearly within its power of policing that commerce to require the elimination of such complications in all cases."

The concluding proposition from the opinion just quoted is well supported by decisions in analogous situations. See Stafford v. Wallace, 1922, 258 U.S. 495, 520, 521, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 40, 43 S.Ct. 470, 67 L.Ed. 839; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 43, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 221, 222, 59 S.Ct. 206, 83 L.Ed. 126.

 Petitioners argue that whatever may be the extent of the power to regulate the practices of public utility holding companies, the orders of the Commission now under review are invalid on the ground that the federal government has no power, through any agency, to decree the dissolution of a state-created corporation. Lillard v. Lonergan, 10 Cir., 1934, 72 F.2d 865, 870, certiorari denied, 1934, 293 U.S. 615, 55 S.Ct. 147, 79 L.Ed. 704. But the orders in question do not purport of their own force to dissolve the petitioners. In effect, the orders require petitioners to submit plans for complete liquidation, the realization of which will be accomplished pursuant to § 11(d) or § 11(e) of the Act; and when this is done, dissolution will follow under state law as a matter of course. The federal power here exercised by the Commission is similar to that exercised by the courts under the antitrust acts. In Northern Securities Co. v. United States, 1904, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, the court asserted its power to "make any order necessary to bring about the dissolution or suppression of an illegal combination that restrains interstate commerce." Page 346 of 193 U.S., page 460 of 24 S.Ct. The decree in that case left the corporation no alternative but complete liquidation. Pages 355, 356 of 193 U.S., page 464 of 24 S.Ct. In Continental Insurance Co. v. United States, 1922, 259 U.S. 156, 42 S.Ct. 540, 66 L.Ed. 871, the court proceeded even more directly to effectuate a dissolution. See pages 163, 167 of 259 U.S., 42 S.Ct. 540. See also United States v. American Tobacco Co., 1911, 221 U.S. 106, 187, 188, 31 S.Ct. 632, 55 L.Ed. 663. Petitioners would have felt no happier about the present orders, if instead of speaking in terms of dissolution the orders had directed petitioners to submit plans looking toward the complete divestment by petitioners of their holdings in their subsidiary companies. In Commonwealth &

Southern Corp. v. Securities and Exchange Commission, 134 F.2d at pages 752, 753, the court said:

"It may be conceded, as Commonwealth urges, that the right to exist as a corporation, the power to own and vote stock in subsidiary companies, the right to issue stock having designated preferences, priorities, voting power and other rights, and the right to retire or redeem securities are all local matters, normally regulated by the laws of the state. It does not follow that Congress is restricted in the exercise of the commerce power because any or all of these rights are affected thereby. That is the fundamental weakness of Commonwealth's contention that if section 11 (b) (2) is construed so as to permit an order which deals solely with the corporate structure of the holding company and the rights of the stockholders among themselves it is unconstitutional because outside the power conferred by the commerce clause. Such a contention takes entirely too narrow a view of the extent of the power conferred upon Congress by the commerce clause, for it is well settled that activities which are in themselves intrastate may be regulated by Congress if they affect interstate commerce."

See, also, Morawetz, The Power of Congress to Enact Incorporation Laws and to Regulate Corporations (1913) 26 Harv. L.Rev. 667, 680, 681.

■ The contention is made that "compulsory involuntary reorganization can only take place through the exercise of the bankruptcy power", and that Congress cannot under the bankruptcy power compel the involuntary reorganization of solvent corporations. But the premise is not well founded, as the antitrust cases demonstrate. Section 11(b) (2) rests upon the commerce power, not the bankruptcy power.

■ Section 11(b) (2) as here applied does not amount to a taking of the private property of petitioners and their security holders for public use without just compensation, in violation of the Fifth Amendment. Petitioners claim that the orders will result in taking their right to exist under their corporate franchises and the valuable property inhering in their organization and financing at great cost. Also, it is urged, the orders take from petitioners their right to retain their investments and from the stockholders their right to retain their indirect interest in such investments through the subholding companies. Reliance is placed upon Louisville Joint Stock Land Bank v. Radford, 1935, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, holding that Congress may not under the bankruptcy power take without compensation the substantive property rights of mortgagees for the benefit of farmer-mortgagors.

■ We do not think that the Radford case is controlling here. Not every curtailment or impairment of existing rights, nor every incidental business loss, resulting from regulatory legislation, is a "taking" in the constitutional sense. See Hamilton v. Kentucky Distilleries Co., 1919, 251 U.S. 146, 157, 158, 40 S.Ct. 106, 64 L.Ed. 194; Mugler v. Kansas, 1887, 123 U.S. 623, 668–670, 8 S.Ct. 273, 31 L.Ed. 205; Block v. Hirsh, 1921, 256 U.S. 135, 155–157, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165. In § 19 of the Banking Act of 1933, 48 Stat. 186-88, 12 U.S.C.A. § 61, a holding company is forbidden to exercise its previously acquired property right to vote its shares of stock in a national bank unless a permit is first obtained from the Federal Reserve Board; and one of the conditions of obtaining such a permit is that the holding company must agree to divest itself within five years of any interest in any company engaged in the flotation or underwriting of securities. Cf. § 11 of the Panama Canal Act of August 24, 1912, 37 Stat. 566, 49 U.S.C.A. § 5; Lehigh Valley R. Co. v. United States, D.C.E.D.Pa.1916, 234 F. 682, affirmed, 1917, 243 U.S. 412, 37 S.Ct. 397, 61 L.Ed. 819. Cf. also paragraph (11) of § 5 of the Interstate Commerce Act, as amended by the Emergency Transportation Act of 1933, 48 Stat. 219, 49 U.S.C.A. § 5(11), and comment in H. Rep. No. 213 (73d Cong., 1st Sess.) p. 14. The court in the Northern Securities case, supra, 193 U.S. at pages 357, 358, 24 S.Ct. at page 465, 48 L.Ed. 679, apparently looking through the corporate fiction and recognizing the stockholders of the holding company as the actual owners of the stock of the subsidiary companies, said: "The decree, if executed, will destroy not the property interests of the original stockholders of the constituent companies, but the power of the holding corporation as the instrument of an illegal combination of which it was the master spirit, to do that which, if done, would restrain interstate and international commerce."

624

Petitioners' argument, if sound, would invalidate the whole of § 11(b). There could be no order under § 11(b) (1) for divestment of scattered holdings. Even the elimination of a third or fourth holding company tier could not be effectuated under the mandatory provisions of § 11(b) (2). It would indeed be a bit ironical if the decision of Brandeis, J., in the Radford case were held to debar Congress from requiring the reorganization and simplification of interstate holding company systems so as to eliminate therefrom features likely to be productive of future consequences harmful to interstate commerce. We attribute no such effect to the Radford case. In North American Co. v. Securities and Exchange Commission, 2 Cir., 1943, 133 F.2d 148, 154, the court said:

"Compelling the holding company to dispose of its securities is not the same as condemning private property for public use without paying just compensation. Under section 11(c) the petitioner is given a year within which to comply with the order and may on proper showing obtain an additional period not exceeding one year. If divestment can be effected by distribution in kind, there may be no loss in values. If, as petitioner contends, such distribution will be impossible and a liquidation by sale becomes necessary, the process may be painful to its common stockholders, but we cannot say. that the remedy selected by Congress is so unreasonable, arbitrary or capricious as to constitute taking property without due process."

 In its broad aspect, § 11(b) (2) as here applied in the exercise of the commerce power does not constitute a deprivation of property without due process of law. In view of the findings by Congress, and by the Commission in this case, the remedy selected cannot be said to be unreasonable or capricious. It bears "a real and substantial relation to the objects sought to be attained", namely, the protection of interstate commerce from various future harmful effects which may be anticipated as likely to flow from the undue complexities and inequitable distribution of voting power in the holding company systems. As the court recognized in Nebbia v. New York, 1934, 291 U.S. 502, 527, 54 S.Ct. 505, 512, 78 L.Ed. 940, 86 A.L.R. 1469, the Constitution "does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned."

 There is the further argument that the proceedings before the Commission violated the due process clause because the security holders were not given notice of the proceedings and were not permitted to vote on the changes to be effected under § 11(b) (2). But the orders under review are directed only to the corporations, which are the named respondents, and we do not perceive that the stockholders are any more indispensable parties here than they are in equity proceedings against corporations under the antitrust acts. Furthermore, the Commission here published in the Federal Register notice of a public hearing of the § 11(b) (2) proceedings, directed not only to the named corporate. respondents but also ."to all other persons, including the security holders and consumers of the said respondents" who were invited to file applications for intervention on or before a certain date. As to the absence of a vote by the security holders, certainly such a vote is inappropriate at the stage where the Commission is seeking to determine, under § 11(b) (2), whether it is necessary to discontinue the existence of the subholding companies in order to ensure that the structure of the Bond & Share system shall not be unduly complicated and that the voting power shall not be inequitably distributed among the security holders of such system. In Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 753, the court had this to say as to the rights of the stockholders in an 11(b) (2) proceeding:

"It is suggested by Commonwealth that the order is also in violation of the Fifth amendment with respect to its stockholders since it directs an alteration in their rights without their consent and without their having been heard. But without granting its validity we think that this point is premature. The order now under review, as we have pointed out, is primarily designed to enable Commonwealth to comply with the mandate of the law by obtaining the voluntary co-operation of its stockholders. If they do thus co-operate and adopt a plan which complies with the Commission's order obviously no question of want of due process can arise. On the other hand if a voluntary readjustment cannot be con-

summated and it becomes necessary to make application to a district court for the enforcement under sections 11(d) or 11(e) of a plan proposed by the Commission or the company the stockholders will have an opportunity to assert in the district court any objections, including want of due process, which they may have to the plan presented in so far as it affects their rights."

■ Section 11(b) (2) as here applied is not an "ex post facto law" in violation of the prohibition of Article I, § 9 of the Constitution. It is immaterial that the structures of the holding company systems may have been built up by means which were lawful prior to the passage of the Public Utility Act of 1935. Section 11 (b) (2) does not seek to punish anyone for past acts, lawful when done. It merely seeks, for the future, to eliminate factors in the structures of holding company systems likely to be productive of harm to interstate commerce. In United States v. Trans-Missouri Freight Association, 1897, 166 U.S. 290, 342, 17 S.Ct. 540, 41 L.Ed. 1007, an anti-trust case, the court rejected a similar argument on the ex post facto point.

■ Finally, petitioners argue at considerable length that § 11(b) (2) constitutes an unconstitutional delegation by Congress of legislative power to the Commission because it fails to set forth adequate standards for the Commission's guidance. Const. art. 1, § 1. Since the decisions in Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, and Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, counsel have hopefully advanced the delegation argument in many cases, without much success. See, for instance, Mulford v. Smith, 1939, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Opp Cotton Mills, Inc., v. Administrator, 1941, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724; National Broadcasting Co., Inc., v. United States, 1943, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; Kiyoshi Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. We think it

clear that the standards in § 11(b) (2), though expressed in general terms, taken in conjunction with the declaration of policy contained in § 1 and the description of the abuses which Congress sought to eliminate, satisfy the constitutional requirements, and afford an adequate guide to the administrative agency. It was so held in Commonwealth & Southern Corp. v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 752. It may be said here, as the court said in Sunshine Anthracite Coal Co. v. Adkins, supra, 310 U.S. at page 398, 60 S.Ct. at page 915, 84 L.Ed. 1263, that "in the hands of experts the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose of the Act. To require more would be to insist on a degree of exactitude which not only lacks legal necessity but which does not comport with the requirements of the administrative process."

Decrees will be entered affirming the orders of the Commission.